[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 14-12558

————————————————

RENARD MARCEL DANIEL,

Petitioner - Appellant,

versus

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,

Respondent - Appellee.

————————————————

Appeal from the United States District Court
for the Northern District of Alabama

————————————————

(May 16, 2016)

Before WILSON, MARTIN, and JILL PRYOR, Circuit Judges.

MARTIN, Circuit Judge:

Petitioner Renard Marcel Daniel, an Alabama prisoner on death row, appeals

the District Court's denial of his 28 U.S.C. § 2254 petition for writ of habeas

corpus.  The District Court granted Mr. Daniel a certificate of appealability (COA)

as to the following issue: "Whether trial counsel was ineffective during Daniel's

trial at both the penalty and guilt phase."  Mr. Daniel narrowed the focus of his

briefing in this Court to trial counsel's failure to investigate and present mitigation evidence at the penalty phase of his capital trial.[1]

Mr. Daniel's childhood was nightmarish by any standard. When he was only three years old, his mother killed his biological father with a shotgun while Mr. Daniel was in the home. Beginning before his tenth birthday, and for several years, Mr. Daniel was repeatedly sexually assaulted by his stepfather and was forced to engage in sex acts with his siblings while his stepfather watched. School records show that Mr. Daniel was placed in special education classes. His test scores are consistent with borderline intellectual disability, and his adaptive functioning is consistent with a person with intellectual disability. A postconviction neuropsychological evaluation confirmed Mr. Daniel suffered from lifelong borderline intellectual functioning, significant impairments in adaptive function both prior to and after age eighteen, childhood dissociative disorder with psychotic features (related to daily sexual, physical, and emotional abuse), and depression since childhood. Mr. Daniel specifically pleaded all of these facts, and more, in his second amended state habeas petition filed pursuant to Alabama Rule of Criminal Procedure 32. All of this mitigation evidence about Mr. Daniel's "background and character is relevant because of the belief, long held by this

---

[1] Because Mr. Daniel has not raised his guilt phase ineffective assistance of counsel claims in his appellate briefing, we consider them abandoned and will not address them in this appeal. See Ruga v. U.S. Att'y Gen., 757 F.3d 1193, 1196 (11th Cir. 2014).

2

society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." Penry v. Lynaugh, 492 U.S. 302, 319, 109 S. Ct. 2934, 2947 (1989) (quotation marks omitted).

But Mr. Daniel's sentencing jury and judge heard none of this mitigation evidence. According to Mr. Daniel, this is because his trial counsel did not conduct a constitutionally adequate investigation into his background. Mr. Daniel also asserts that trial counsel's deficient performance prejudiced the outcome of his penalty phase. While trial counsel presented some mitigation evidence during the penalty phase through Mr. Daniel's mother, the description, details, and depth of abuse in Mr. Daniel's background that he brought to the attention of the state courts in his habeas proceedings far exceeded anything the sentencing jury and judge were told. Nonetheless, the Alabama state courts denied Mr. Daniel's claim without discovery or an evidentiary hearing, finding that he failed to specifically and sufficiently plead his ineffective assistance of counsel claim under Alabama Rules of Criminal Procedure 32.6(b) and 32.7(d). The District Court denied habeas relief. After thorough review of the record and oral argument, we affirm the District Court's denial of Mr. Daniel's guilt phase ineffective assistance of counsel claim, but reverse the District Court's ruling as to Mr. Daniel's penalty

3

phase ineffective assistance of counsel claim and remand for an evidentiary hearing.

## I. BACKGROUND

### A. OFFENSE AND CHARGES

On September 26, 2001, John Brodie and Loretta McCulloch were shot to death in their apartment in Birmingham, Alabama. See Daniel v. State, 906 So. 2d 991, 994–95 (Ala. Crim. App. 2004) (Daniel I). According to the trial testimony of George Jackson—a friend of Mr. Daniel's who lived in the same apartment complex as Mr. Daniel, Mr. Brodie, and Ms. McCulloch—Mr. Daniel shot Mr. Brodie and Ms. McCulloch following a card game after Mr. Brodie used racial slurs and Ms. McCulloch taunted Mr. Daniel by refusing to return his cigarettes. About twelve hours after the shooting, Mr. Jackson reported the crime to the police, exculpating himself and implicating Mr. Daniel. Mr. Daniel was arrested later that day for the murders based on the information provided by Mr. Jackson. He was indicted on March 8, 2002, for capital murder under Alabama Criminal Code § 13A-5-40(a)(10).

### B. TRIAL

Because Mr. Daniel was not able to afford an attorney, Jefferson County Circuit Judge Tommy Nail appointed Katheree Hughes to represent Mr. Daniel on October 15, 2001. Judge Nail later appointed Danita Haskins on July 19, 2002, to

4

assist Mr. Hughes.[2]  Mr. Daniel's trial began on March 10, 2003.  The state presented the testimony of Mr. Jackson implicating Mr. Daniel, as well as the testimony of other witnesses and forensic and physical evidence that corroborated Mr. Jackson's testimony.  Mr. Daniel testified that it was Mr. Jackson who shot Mr. Brodie and Ms. McCulloch.  On March 14 at 2:10 p.m., the jury found Mr. Daniel guilty of capital murder.

## C.  PENALTY PHASE

Five minutes later, the trial court tried to start the sentencing hearing before the jury, but trial counsel requested an adjournment until the following morning "in order to get enough time to go through all the information [trial counsel] need[ed] to go through" to start the sentencing hearing.  The trial court gave the defense thirty minutes.

The state presented no additional witnesses during the penalty phase before the jury, instead relying on evidence presented during the guilt phase and documentary exhibits to prove two of the three aggravating circumstances it asserted: (1) Mr. Daniel was on probation when the offense occurred, Ala. Code § 13A-5-49(1); and (2) he previously was convicted of a felony involving the use or threat of violence, id. § 13A-5-49(2).  In closing arguments, the state elaborated on the second circumstance, telling the jury that Mr. Daniel's

---

[2] We will refer to Mr. Hughes and Ms. Haskins both individually and collectively as trial counsel.

earlier conviction for second degree burglary involved "entering or remaining in someone's home for the purpose of committing rape." Because he now stood convicted of murdering both Mr. Brodie and Ms. McCulloch, the state also told the jury that Mr. Daniel had a third aggravating circumstance, that is killing two people during one course of conduct. See id. § 13A-5-49(9).

The only witness defense counsel presented was Carolyn Daniel, Mr. Daniel's mother. In her brief testimony, which occupies only ten double-spaced pages of transcript, Mrs. Daniel touched on some of the low points in her son's life. She told the jury that Mr. Daniel had Attention Deficit Hyperactivity Disorder (ADHD) and dyslexia; that he dropped out of school in the tenth grade; and that Mr. Daniel's biological father died when Mr. Daniel was three. Mrs. Daniel also testified that Mr. Daniel's stepfather, Earnest Western, "abused [him] and I didn't know about it for a long time." She described only one specific instance of abuse. When Mr. Daniel was about twelve years old Mrs. Daniel said she left him "[o]ne night" with his stepfather and, when she got home, Mr. Daniel told her "that he had gotten a beating by his stepdad" and that he had blood in his urine. When she took Mr. Daniel to the hospital, "[i]t was discovered that one of his kidneys had been damaged from the beating." As a result, protective services removed Mr. Daniel and his two sisters from the home for about ten months, and Mr. Daniel was placed in a group home. When the family reunited, Mrs. Daniel says Mr. Daniel was

6

"withdrawn" and "always seem[ed] like he was hurting on the inside." Mr. Daniel started drinking beer at about age sixteen, and "on one occasion" Mrs. Daniel found marijuana in his room. Finally, Mrs. Daniel pleaded to the jury for her son's life.

Two hours and twenty minutes after the penalty phase began, the jury returned a 10 to 2 verdict for death. Then on May 9, 2003, the trial court conducted a sentencing hearing without the jury, which is the procedure called for by Alabama law. See Ala. Code § 13A-5-47. The state presented no additional evidence of aggravating circumstances, but it did present the testimony of Spencer Sims, Ms. McCulloch's father, who spoke of forgiveness and asked for a life sentence. The defense called Carolyn Daniel, as it had during the penalty phase, and called Mr. Daniel's sister, Tammi Daniel, as well. Both asked the trial court to spare Mr. Daniel's life. After hearing this testimony, the trial court accepted the jury's recommendation and sentenced Mr. Daniel to death. Immediately after imposing the sentence, the trial court granted trial counsel's request to be relieved of any further responsibility in Mr. Daniel's case.

D. DIRECT APPEAL

The trial court then appointed James Kendrick and Steven Wallace to represent Mr. Daniel on appeal.

The Court of Criminal Appeals remanded the case due to an improper sentencing order. Daniel I, 906 So. 2d at 1001–02. Specifically, the court found that the trial court's written sentencing order did not comply with state law, which requires the trial court to make "specific written findings concerning the existence or nonexistence" of aggravating and mitigating circumstances. Id. (quoting Ala. Code § 13A-5-47(d)). On remand, the trial court entered an order finding three aggravating circumstances: (1) the capital offense was committed while the defendant was under a sentence of imprisonment; (2) Mr. Daniel had already been convicted of a felony involving the use of violence to the person, here, "Defendant pled guilty to burglary 2 [degree] with the intent to commit rape"; and (3) the "Defendant intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct." The trial court found no statutory mitigating circumstances. After summarizing the brief testimony of Carolyn Daniel given before the jury during the penalty phase of Mr. Daniel's trial, as well as the testimony of Carolyn Daniel, Spencer Sims, and Tammi Daniel given at the separate sentencing hearing before the judge, the trial court found "the aggravating circumstances outweigh the mitigating circumstances and [are] sufficient to uphold the Jury's recommendation of punishment."

On return after remand, the Alabama Court of Criminal Appeals affirmed Mr. Daniel's convictions and death sentence in August 2004. Daniel I, 906 So. 2d

8

at 1004.  The Alabama Supreme Court denied his petition for certiorari on

February 18, 2005.  Id. at 991.  The United States Supreme Court denied certiorari

review.  Daniel v. Alabama, 546 U.S. 846, 126 S. Ct. 96 (2005) (mem.).

E.  STATE POSTCONVCITION

On February 14, 2006, Mr. Daniel, through new counsel, timely filed a state

petition for postconviction relief pursuant to Rule 32 of the Alabama Rules of

Criminal Procedure.  His first Rule 32 petition specifically alleged the

ineffectiveness of his trial counsel, including allegations that trial counsel were

ineffective for failing to conduct a thorough investigation for the penalty phase,

which would have uncovered material admissible evidence about Mr. Daniel's

excruciating past.  Mr. Daniel's Rule 32 petition also pleaded that he was

prejudiced by trial counsel's errors and omissions.  Ten days after filing the Rule

32 petition, postconviction counsel moved for discovery seeking, among other

things, mental health, social services, and school records relevant to the ineffective

assistance of trial counsel allegations in the Rule 32 petition.

In May 2006, the state filed a motion to dismiss, which the postconviction

court granted without giving Mr. Daniel an opportunity to respond or

acknowledging his discovery request.  After Mr. Daniel filed a motion for

reconsideration, the postconviction court granted him permission to submit an

amended petition.  In October 2006 Mr. Daniel filed his first amended Rule 32

9

petition. He also filed an amended motion for discovery in order to vindicate, among other things, claims that trial counsel were ineffective for failing to investigate and present available mitigating evidence, failing to procure the expert assistance of a mental health/mitigation expert, and failing to challenge Mr. Daniel's second degree burglary conviction. Following oral argument to determine whether an evidentiary hearing was warranted, the state postconviction court granted Mr. Daniel leave to file a second amended petition.

Without the benefit of discovery or an evidentiary hearing, Mr. Daniel filed a 96-page second amended Rule 32 petition in August 2007. This second amended petition was filed together with 21 exhibits, including school, mental health, and social service records, along with other documentary evidence, all in support of Mr. Daniel's allegations that if trial counsel had conducted even a cursory investigation of his background, they would have discovered compelling mitigation evidence.

In December 2008, the Rule 32 trial court entered an order summarily dismissing the second amended Rule 32 petition, again without having permitted any discovery and having conducted no evidentiary hearing. The postconviction court dismissed the petition on several grounds without specifying which ground applied to which claims.[3]

---

[3] The Rule 32 trial court's order stated:

10

Mr. Daniel appealed the dismissal to the Alabama Court of Criminal

Appeals, which affirmed in a reasoned opinion. See Daniel v. State, 86 So. 3d 405

(Ala. Crim. App. 2011) (Daniel II). The Court of Criminal Appeals acknowledged

that the postconviction trial "court stated alternative grounds for denying relief on

Daniel's claims of ineffective assistance of counsel." Id. at 414. But the Court of

Criminal Appeals affirmed the trial court's summary dismissal of Mr. Daniel's

petition at the pleading stage "[f]or the reasons set out in [the Court of Criminal

Appeals] opinion"—mainly that Mr. Daniel failed to sufficiently and specifically

plead his claims under Alabama Rule of Criminal Procedure 32.6(b) and 32.7(d).

Id. at 414, 429–40. The Court of Criminal Appeals also expressed disagreement

with the trial court's other reasoning.[4] Id. at 414 & n.3. Thus, this is not a case in

which a state trial and appellate court agreed on the reasons for denying a

postconviction petition. The Alabama Supreme Court denied Mr. Daniel's petition

for writ of certiorari in summary fashion, so we agree with the State of Alabama

that the Alabama Court of Criminal Appeals decision in Daniel II must be the

> This Court finds that Petitioner's allegations of ineffective assistance of trial
> counsel either do not meet the specificity requirements of Rule 32.6(b), raise
> grounds that were raised at trial in violation of Rule 32.2(a)(3), raise grounds that
> were raised by Petitioner on direct appeal in violation of Rule 32.2(a)(4), raise
> grounds which could have been but were not raised on direct appeal in violation
> of Rule 32.2(a)(5), are without merit, or fail to state an issue of fact or law.

[4] Indeed, the Court of Criminal Appeals expressly disagreed with the postconviction trial
court's conclusion that one ineffective assistance of counsel claim was procedurally barred. See
Daniel II, 86 So. 3d at 414 n.3.

11

focus of our evaluation when applying the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). See McGahee v. Ala. Dep't of Corr., 560 F.3d 1252, 1261 n.12 (11th Cir. 2009).

## F.  FEDERAL PETITION

Mr. Daniel timely filed his first and only federal petition for writ of habeas corpus in July 2012. He also filed motions for discovery and an evidentiary hearing in the District Court. The District Court denied relief without an evidentiary hearing or discovery, but did grant Mr. Daniel a certificate of appealability on his ineffective assistance of counsel claims.

## II. STANDARD OF REVIEW

We review de novo the District Court's ultimate decision denying a 28 U.S.C. § 2254 petition. Ray v. Ala. Dep't of Corr., 809 F.3d 1202, 1207 (11th Cir. 2016). "We review the District Court's legal conclusions de novo and its factual findings for clear error." Hardwick v. Sec'y, Fla. Dep't of Corr., 803 F.3d 541, 545 (11th Cir. 2015).

Because Mr. Daniel filed his federal habeas petition after April 24, 1996, our review is governed by AEDPA. See Pope v. Sec'y for Dep't of Corr., 680 F.3d 1271, 1281 (11th Cir. 2012). Generally, AEDPA bars federal courts from granting habeas relief to a state habeas petitioner on a claim that was adjudicated on the merits in state court unless the state court's adjudication:

12

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Clearly established" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta," of the Supreme Court's cases at the time of the relevant state court decision. Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523 (2000). "Contrary to" means the state court applied "a rule different from the governing law set forth in [Supreme Court] cases, or [] it decide[d] a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." Bell v. Cone, 535 U.S. 685, 694, 122 S. Ct. 1843, 1850 (2002). An "unreasonable application" under § 2254(d)(1) occurs when a state court decision (1) "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams, 529 U.S. at 407, 120 S. Ct. at 1520. The "'unreasonable application' inquiry . . . ask[s] whether the state court's application of clearly established federal law was objectively unreasonable," id. at

13

409, 120 S. Ct. at 1521, which "requires the state court decision to be more than incorrect or erroneous." Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166, 1174 (2003); see also Harrington v. Richter, 562 U.S. 86, 101, 131 S. Ct. 770, 786 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149 (2004))).

However, AEDPA does not "prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced. The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner." Panetti v. Quarterman, 551 U.S. 930, 953, 127 S. Ct. 2842, 2858 (2007) (citation and quotation omitted).

Further, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the prisoner's claim on the merits." Greene v. Fisher, 565 U.S. ___, ___, 132 S. Ct. 38, 44 (2011). Section 2254(d)(1) requires federal courts to "focus[] on what a state court knew and did" and to evaluate the reasonableness of the state court's decision "against [the Supreme] Court's precedents as of the time the state court render[ed] its decision." Cullen v. Pinholster, 563 U.S. 170, 182, 131 S. Ct. 1388, 1399 (2011) (quotation omitted).

14

When evaluating whether a state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under § 2254(d)(2), "[w]e may not characterize . . . state-court factual determinations as unreasonable 'merely because [we] would have reached a different conclusion in the first instance.'" Brumfield v. Cain, 576 U.S. ___, ___, 135 S. Ct. 2269, 2277 (2015) (second alteration in original) (quoting Wood v. Allen, 558 U.S. 290, 301, 130 S. Ct. 841, 849 (2010)). Section 2254(d)(2), like § 2254(d)(1), requires that federal courts afford state court factual determinations "substantial deference." Id. If "[r]easonable minds reviewing the record might disagree about" the state court factfinding in question, "on habeas review that does not suffice to supersede" the state court's factual determination. Rice v. Collins, 546 U.S. 333, 341–42, 126 S. Ct. 969, 976 (2006). We also presume findings of fact made by state courts are correct, unless a petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "When considering a determination of a mixed question of law and fact, such as a claim of ineffective assistance of counsel, the statutory presumption of correctness applies to only the underlying factual determinations." Tanzi v. Sec'y, Fla. Dep't of Corr., 772 F.3d 644, 651 (11th Cir. 2014).

In sum, AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." White v. Wheeler,

577 U.S. ___, ___, 136 S. Ct. 456, 460 (2015) (per curiam) (quotation omitted).

But the Supreme Court has explained, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003). "Deference does not by definition preclude relief." Id. "[I]f a convicted state criminal defendant can show a federal habeas court that his conviction rests upon a violation of the Federal Constitution, he may well obtain a writ of habeas corpus that requires a new trial, a new sentence, or release." Trevino v. Thaler, 569 U.S. ___, ___, 133 S. Ct. 1911, 1917 (2013).

Once a federal court determines that a state court decision is unreasonable under § 2254(d), "we are unconstrained by § 2254's deference and must undertake a de novo review of the record." Adkins v. Warden, Holman CF, 710 F.3d 1241, 1255 (11th Cir. 2013) (quotation omitted).

### III.  DISCUSSION

Because the Alabama Court of Criminal Appeals issued a reasoned opinion that adjudicated Mr. Daniel's penalty phase ineffective assistance of counsel claim on the merits, we follow a two-step analysis from Richter, 562 U.S. at 102, 131 S. Ct. at 786.  First, we "determine what arguments or theories support[] . . . the state court's decision"; second, we "ask whether it is possible fairminded jurists could

16

disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e] [Supreme] Court." Id.

The Court of Criminal Appeals correctly identified Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), as the proper standard for evaluating Mr. Daniel's ineffective assistance of counsel claims. Daniel II, 86 So. 3d at 415. However, in doing so, the Court of Criminal Appeals dissected Mr. Daniel's penalty phase ineffective assistance of counsel claims into thirteen subparts, and in that way concluded most of them were properly dismissed under Alabama Rule of Criminal Procedure 32.6(b),[5] because Mr. Daniel failed to plead his claim with sufficient specificity, id. at 429–30, 434, 436–38, 440, or under Rule 32.7(d)[6] because Mr. Daniel failed to state a claim, id. at 429–31, 433–35, 437–40.

---

[5] Rule 32.6(b) requires specificity in pleading habeas claims:

Specificity. Each claim in the petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.

Ala. R. Crim. P. 32.6(b).

[6] Rule 32.7(d) governs summary disposition of Rule 32 petitions:

Summary Disposition. If the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition. Leave to amend shall be freely granted. Otherwise, the court shall direct that the proceedings continue and set a date for hearing.

Ala. R. Crim. P. 32.7(d).

17

Summary dismissals under Rules 32.6(b) and 32.7(d) are adjudications on the merits and subject to AEDPA review. See Frazier v. Bouchard, 661 F.3d 519, 525 (11th Cir. 2011); Borden v. Allen, 646 F.3d 785, 808 (11th Cir. 2011).

Thus, AEDPA requires us "to evaluate whether the Court of Criminal Appeals's determination that [Mr. Daniel's] relevant ineffective assistance of counsel claims were due to be dismissed for failure to state a claim with sufficient specificity under Rule 32.6(b) was 'contrary to, or involved an unreasonable application of, clearly established Federal law,'" Borden, 646 F.3d at 817–18 (quoting 28 U.S.C. § 2254(d)(1)), or whether it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). See also Powell v. Allen, 602 F.3d 1263, 1273 (11th Cir. 2010) (per curiam) ("AEDPA limits our review to whether the state court's determination that Powell failed to plead sufficient facts in his Rule 32 petition to support a claim of ineffective assistance of counsel was contrary to or an unreasonable application of Supreme Court precedent."). We must therefore answer two questions to resolve this habeas appeal. First, whether Mr. Daniel's second amended Rule 32 petition and its attached exhibits pleaded enough specific facts that, if proven, amount to a valid

18

penalty phase ineffective assistance of counsel claim.[7]  Second, if we answer the first question in the affirmative, we must determine whether the Alabama Court of Criminal Appeals's decision to the contrary was unreasonable under § 2254(d).

In conducting our evaluation, we are mindful that "at the pleading stage of Rule 32 proceedings [in Alabama], a Rule 32 petitioner does not have the burden of proving his claims," Ford v. State, 831 So. 2d 641, 644 (Ala. Crim. App. 2001), and that facts Mr. Daniel alleged in his Amended Rule 32 petition and supporting exhibits are assumed to be true under Alabama law, see Ex parte Williams, 651 So. 2d 569, 572–73 (Ala. 1992).  However, to meet the pleading requirements of Rule 32.6(b), Mr. Daniel's petition had to

> identify the specific acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment . . . [and] plead specific facts indicating that [Mr. Daniel] was prejudiced by the acts or omissions, i.e., facts indicating that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A bare allegation that prejudice occurred without specific facts indicating how the petitioner was prejudiced is not sufficient.

Daniel II, 86 So. 3d at 416 (alteration adopted and citations omitted) (quoting Hyde v. State, 950 So. 2d 344, 356 (Ala. Crim. App. 2006)).  Further, this specificity

---

[7]  "Although a Rule 32 petitioner is not required to include attachments to his or her petition in order to satisfy the pleading requirements in Rule 32.3 and Rule 32.6(b), when a petitioner does so, those attachments are considered part of the pleadings." Conner v. State, 955 So. 2d 473, 476 (Ala. Crim. App. 2006); see also Ex parte Lucas, 865 So. 2d 418, 421 (Ala. 2002) (attachments to a Rule 32 petition are considered part of the pleadings).  We note the State of Alabama confirmed at oral argument that the exhibits Mr. Daniel attached to his second amended Rule 32 petition are considered part of the pleadings.

requirement attached to each allegation in the petition regarding trial counsel's deficient performance and the prejudice that flowed from it. Id.; see also Coral v. State, 900 So. 2d 1274, 1284 (Ala. Crim. App. 2004), rev'd on other grounds, Ex parte Jenkins, 972 So. 2d 159 (Ala. 2005).

## A.  DEFICIENT PERFORMANCE UNDER STRICKLAND

To state a facially sufficient ineffective assistance of counsel claim, Mr. Daniel must show both that his trial counsel's performance was deficient and that he was prejudiced as a result. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. For the deficient performance prong, Mr. Daniel must demonstrate that trial "counsel's representation fell below an objective standard of reasonableness." Id. at 688, 104 S. Ct. at 2064. Reviewing courts apply a "strong presumption" that counsel's representation was "within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689, 104 S. Ct. at 2065 (quotation omitted). When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance.[8] See Richter, 562 U.S. at 105, 131 S. Ct. at 788.

---

[8] See also Evans v. Sec'y, Dep't of Corr., 703 F.3d 1316, 1333–35 (11th Cir. 2013) (en banc) (Jordan, J., concurring) (explaining that double deference to a state court's adjudication of a Strickland claim applies only to Strickland's performance prong, not to the prejudice inquiry).

And in any event, it is well established that "strategic choices made [by trial counsel] after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690–91, 104 S. Ct. at 2066. This means "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691, 104 S. Ct. at 2066.

In the capital sentencing context, the Eighth and Fourteenth Amendments require "individualized consideration of mitigating factors." Lockett v. Ohio, 438 U.S. 586, 606, 98 S. Ct. 2954, 2965 (1978). To give effect to this rule, "it is unquestioned that under the prevailing professional norms at the time of [Mr. Daniel's 2003] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'"[9] Porter, 558 U.S. at 39, 130 S. Ct. at 452

---

[9] The fact that the Supreme Court has found counsel provided ineffective assistance in capital trials that took place long before Mr. Daniel's 2003 trial demonstrates beyond peradventure that clearly established federal law, as well as prevailing professional norms, required Mr. Daniel's trial counsel to conduct a thorough background investigation for mitigation. See Sears v. Upton, 561 U.S. 945, 130 S. Ct. 3259 (2010) (per curiam) (1993 trial); Porter v. McCollum, 558 U.S. 30, 130 S. Ct. 447 (2009) (per curiam) (1988 trial); Rompilla v. Beard, 545 U.S. 374, 125 S. Ct. 2456 (2005) (1988 trial); Wiggins v. Smith, 539 U.S. 510, 123 S. Ct. 2527 (2003) (1989 trial); Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000) (1986 trial).

(quoting Williams, 529 U.S. at 396, 120 S. Ct. at 1515); accord Rompilla, 545 U.S. at 385–86, 125 S. Ct. at 2465.

When assessing the reasonableness of an attorney's performance, the Supreme Court has looked to standards promulgated by the American Bar Association (ABA) as appropriate guides.[10]  See Wiggins, 539 U.S. at 524, 123 S. Ct. at 2536–37; see also Van Hook, 558 U.S. at 7–8, 130 S. Ct. at 17 (recognizing that in 1985, the ABA standards—which we can look to as "guides"—provided that "[i]nformation concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant [to a mitigation investigation], as will mitigating circumstances surrounding the commission of the offense itself" (alteration in original)); Rompilla, 545 U.S. at 387, 125 S. Ct. at 2465–66; Williams, 529 U.S. at 396, 120 S. Ct. at 1514–15.

---

[10]  Of course, we recognize the ABA Guidelines serve as guides to what is reasonable attorney performance, rather than inexorable commands.  See Strickland, 466 U.S. at 688, 104 S. Ct. at 2065 ("Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable, but they are only guides."); see also Bobby v. Van Hook, 558 U.S. 4, 7, 130 S. Ct. 13, 16 (2009) (per curiam) ("Restatements of professional standards, we have recognized, can be useful as guides to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place." (quotation omitted)).  Thus, when considering the guidance offered by the ABA standards in existence at the time of Mr. Daniel's 2003 trial, we are also mindful of Strickland's admonition: "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."  466 U.S. at 688–89, 104 S. Ct. at 2065.

In <u>Wiggins</u>, for example, the Supreme Court noted the 1989 "ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" 539 U.S. at 524, 123 S. Ct. at 2537 (emphasis omitted) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 11.4.1(C) (1989)).[11]

1.  The Sufficiency of Mr. Daniel's Second Amended Rule 32 Petition Allegations Regarding Counsel's Deficient Performance

Mr. Daniel's second amended Rule 32 petition pleaded more than sufficient specific facts about trial counsel's acts and omissions to show their penalty phase investigation "fell below an objective standard of reasonableness." <u>Strickland</u>, 466 U.S. at 688, 104 S. Ct. at 2064.  For starters, Mr. Daniel pleaded that trial counsel had almost no meaningful contact with him or his family prior to trial.

---

[11] The ABA Guidelines in effect at the time of Mr. Daniel's 2003 capital trial reaffirmed that "counsel has a duty to investigate the case thoroughly," recognizing "[c]ounsel's duty to investigate and present mitigating evidence." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.7, commentary (Rev. Feb. 2003).  "Because the sentencer in a capital case must consider in mitigation, anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant, . . . [c]ounsel needs to explore: . . . Family and social history (including physical, sexual, or emotional abuse . . .)." <u>Id.</u> (quotation omitted).  Counsel must also explore "[e]ducational history (including achievement, performance, behavior, and activities) [and] special educational needs (including cognitive limitations and learning disabilities)." <u>Id.</u>

Not surprisingly, in furtherance of these goals, the 2003 Guidelines state: "[c]ounsel should use all appropriate avenues . . . to obtain all potentially relevant information pertaining to the client, his or her siblings and parents, and other family members," such as "school records," "social service and welfare records," and "criminal and correctional records." <u>Id.</u>

23

Specifically, he pleaded that "[t]rial [c]ounsel first met [him] at the preliminary hearing for his capital case in October of 2001. The next time [t]rial [c]ounsel spoke to Mr. Daniel was sixteen months later—just three days before the commencement of Mr. Daniel's capital trial." During the sixteen months Mr. Daniel was waiting for his trial, he wrote letters to trial counsel seeking to meet with them about his case.[12] "Trial [c]ounsel simply ignored his request for a meeting." Concerned about having such little contact with his trial counsel, Mr. Daniel wrote the Alabama Bar Association before his trial to lodge a complaint against trial counsel. Then when trial counsel did eventually meet with Mr. Daniel, rather than "focusing on the information about his case that Mr. Daniel was attempting to relay, [trial counsel] Mr. Hughes was far more interested in discussing Mr. Daniel's complaint to the Alabama Bar Association."

---

[12]   Mr. Daniel's second amended Rule 32 petition affirmatively pleaded that Mr. Daniel did not personally write all of the letters that he sent to trial counsel. For example, with respect to a letter that Mr. Daniel sent to trial counsel requesting discovery, the Rule 32 petition stated:

> Current counsel respectfully submits that the text of the letter in question was not in fact written by Mr. Daniel. Mr. Daniel, after many desperate attempts to contact [t]rial [c]ounsel, discussed his plight with another inmate at Kilby Correctional Facility, "Doc" Lane, who worked in the facility's law library. It was Mr. Lane's idea to send these letters and Mr. Lane who drafted them and gave them to Mr. Daniel to sign. As demonstrated below, Mr. Daniel's actual intelligence level falls far below that which would be necessary to write such a letter as the one read by this Court at the May 31st hearing and those attached hereto as Exhibits A and C. Attached hereto as Exhibit S is an example of a letter written by Mr. Daniel.

Mr. Daniel also pleaded that his family fared no better in their attempts to communicate with trial counsel and as a result, "[t]rial [c]ounsel never interviewed in any meaningful way any members of [his] immediate family." Specifically, Mr. Daniel pleaded that trial counsel ignored numerous efforts by his mother and sister to provide relevant background information:

46. Carolyn Daniel, Mr. Daniel's mother, made a series of attempts to contact Mr. Hughes by phone and left several messages at his office. When Mr. Hughes finally returned one of those messages, he gave her no more than twenty minutes of his time and expressed no interest in meeting her or having further discussions. The extent of [t]rial [c]ounsel's pretrial communications with Mr. Daniel's mother was one brief telephone call.

47. Had [t]rial [c]ounsel had even a five minute conversation of substance with Mrs. Daniel, it is likely that they would have discovered facts about Mr. Daniel's tragic childhood, including that when Mr. Daniel was just 3 years old he was present when his mother shot and killed his biological father . . . <u>and that his stepfather emotionally, physically, and sexually abused Mr. Daniel including forcing him to engage in sex acts with his two older sisters when Mr. Daniel was less than ten years old</u>.

48. Tammi Daniel, Mr. Daniel's sister, also attempted to contact [t]rial [c]ounsel by telephone on a number of occasions before her brother's trial. After Mr. Hughes failed to return a single one of her calls, she took matters in her own hands and drove all the way from Atlanta to Birmingham to speak to Mr. Hughes in person. He was unavailable.

49. Despite Tammi's demonstrated willingness to assist in her brother's defense, Mr. Hughes spoke with Tammi for less time than he spoke to her mother in the sixteen months leading up to trial. Ms. Haskins never spoke with her. In the one or two abbreviated conversations that they had, Mr. Hughes never asked Ms. Daniel about . . . her family background, Mr. Daniel's character, or her opinion of Mr. Daniel's guilt. Nor did he seek her assistance in

25

contacting any other family members.  Had Mr. Hughes engaged in a meaningful conversation with Mrs. Daniel he would have learned about Mr. Daniel's past.

(Emphasis added.)

Although there is no required number of meetings a trial attorney must have with his client and family members before trial, trial counsel's failure to conduct any timely and meaningful mitigation interviews with Mr. Daniel and his family was objectively unreasonable under the circumstances of this case.  We easily conclude that no competent attorney in 2003 would have failed to conduct timely and thorough background interviews with the defendant and his immediate family members when they were ready, willing, and available to speak with trial counsel and even contacted counsel on their own.

### a.  Investigation of Conditions of Childhood

Our conclusion is supported by Mr. Daniel's second amended Rule 32 petition, which specifically detailed the chronic physical, emotional, and sexual abuse that the jury never heard, and that trial counsel could have gotten from timely and meaningful interviews of Mr. Daniel,[13] his mother, or sister.  For example:

---

[13]  While it is generally true that trial counsel is not ineffective for failing to discover mitigating evidence that a defendant does not tell trial counsel about, see DeYoung v. Schofield, 609 F.3d 1260, 1287–88 (11th Cir. 2010), this is not a case where trial counsel relied on what his client told him or failed to tell him.  To the contrary, Mr. Daniel specifically pleaded that trial counsel never afforded him or his family members a meaningful opportunity to tell trial counsel about his background.  Neither is this a situation where trial counsel used a mitigation

120. Mr. Daniel's mother married Ernest Western, a former Green Beret, when Mr. Daniel was seven years old. The couple lived together for the next 4 years. Mr. Daniel and his two sisters, along with Mr. Western's two children, also lived in the house. During that time, Mr. Western terrorized all members of the Daniel household.[14] He frequently walked around the house carrying a gun and wearing a sash of bullets. In front of the children, Mr. Western regularly beat Mrs. Daniel and threatened her with various forms of torture—including burning her hands in the fireplace.

121. Mr. Western "physically abused [Mr. Daniel] at least twice a week during the time that Mr. Western lived in the home." The sole instance of such abuse that [t]rial [c]ounsel introduced to the jury was the time when Mr. Western beat Mr. Daniel (then barely 10 years old) so severely that Mr. Daniel's kidney ruptured, which resulted in Mr. Daniel being hospitalized and subsequently removed from the family home. But there were many, many other beatings.

---

investigator or mental health professional to interview the defendant and his family and they failed to disclose relevant mitigating evidence when questioned. See, e.g., id. Accepting the facts Mr. Daniel pleaded in his second amended Rule 32 petition as true, there is no basis for blaming the defendant or the defendant's family for trial counsel's failure to discover mitigating evidence in their possession. Rather, this record reveals trial counsel who failed to fulfill their obligation to conduct a thorough background investigation. This is especially true where, as here, there is no evidence that trial counsel had a strategic reason for not conducting a more thorough background investigation or that trial counsel had reason to believe further investigation would be fruitless. The undisputed allegations strongly support the conclusion that trial counsel's failure to conduct a more thorough background investigation had more to do with their inattention to the defendant's background until the eleventh hour, than a reasonable strategic decision made after adequate investigation. See Wiggins, 539 U.S. at 526, 123 S. Ct. at 2537 ("The record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment.").

[14] According to a psychological report attached to Mr. Daniel's second amended Rule 32 petition, "Mrs. Carolyn Daniel reported that Mr. Western was a very violent and dangerous man." After serving in the Vietnam War, "Mr. Western reportedly suffered from psychological symptoms apparently related to his combat experience. Mrs. Daniel said that he experienced flashbacks of Vietnam and would lie in wait in bedroom closets, and walked around the house at night with a loaded gun. He also had unpredictable fits of rage."

122. Information about the true extent of the physical abuse Mr. Western heaped on the Daniel children, and Mr. Daniel in particular, was readily available to [t]rial [c]ounsel from Mr. Daniel himself and Mr. Daniel's older sister, Tammi.  Had [t]rial [c]ounsel asked either of them about Mr. Western's physical abuse of Mr. Daniel, he would have learned that Mr. Western beat Mr. Daniel regularly and far more severely than any of the other children in the household.  Such information easily could and should have been introduced to the jury.

123. In addition to routinely administering extremely physical violent beatings, "[o]n almost a daily basis, [Mr. Daniel and his sisters] were forced downstairs to the basement late at night to perform sexual acts on each other while Mr. Western watched.  Mr. Western would then engage in sexual acts with all three of the children."

124. Each of the Daniel children lived in fear of Mr. Western as a result of the violent sexual assaults they suffered at his hands.  At night, the children tried not to get up to go to the bathroom because when they did, Mr. Western would grab them and molest them.  During the winter months, the children huddled outside their house in the cold because they did not want to be alone in the house with Mr. Western while their mother was at work.

125. During the years that Mr. Western terrorized the Daniel children, Mr. Daniel would grab on to his mother's leg screaming and crying and try to prevent her from leaving the family home.

(Quoting neuropsychological report attached to petition.)  This record includes no indication that a reasonable attorney would have had any reason to believe that conducting meaningful and timely interviews of Mr. Daniel, his mother, and sister Tammi would have been fruitless, counterproductive, or inconsistent with the evidence counsel did present at the penalty phase.

Beyond our decision that Mr. Daniel pleaded sufficient facts to show counsel's background investigation was deficient, we also conclude that the

28

information uncovered by trial counsel in their cursory investigation would have led a reasonable attorney to investigate further. See Wiggins, 539 U.S. at 527, 123 S. Ct. at 2538. For example, trial counsel failed to follow up on critical information they learned in their brief conversation with Mr. Daniel's mother. On the first day of trial, trial counsel moved for a psychiatric evaluation of Mr. Daniel and advised the trial court that Mr. Daniel's mother told them he suffered from attention deficit disorder, only went to the tenth grade in school, and "always had problems learning, adjusting and those kind of problems." Further, counsel told the trial court:

> Even when [Mr. Daniel] was in school, he did not do a lot as far as academic achievement. And it was my understanding that they attempted to get him help while he was there.
>
> And the other thing, Judge, that came to our attention is that while he was in school, he had such a degree of problems that he was placed in the foster care system to try to correct some of his behavior. [15]

Information about Mr. Daniel's "problems learning" and the fact his family "attempted to get him help" should have been red flags to trial counsel, alerting them to the need for more investigation. See Rompilla, 545 U.S. at 392, 125 S. Ct. at 2468–69; see also Wiggins, 539 U.S. at 525, 123 S. Ct. at 2537 (holding the

---

[15] Trial counsel's statement to the trial court that Mr. Daniel "was placed in the foster care system to try to correct some of his behavior" demonstrates how little trial counsel knew about Mr. Daniel's background on the first day of trial. As the evidence at trial showed, Mr. Daniel was placed in a home for boys after his stepfather beat him so severely that his kidney ruptured and he urinated blood, not because he suffered from a learning disability or behavioral problems.

29

"scope" of trial counsel's "investigation was also unreasonable in light of what counsel actually discovered"). Yet trial counsel did not take the simple step of getting Mr. Daniel's school records.

Although in some instances "searching for old records can promise less than looking for a needle in a haystack," this is not such a case. Rompilla, 545 U.S. at 389, 125 S. Ct. at 2467. To begin, Mr. Daniel's school records should have been easy to get. Mr. Daniel went to school in Birmingham for some years, and this is where his trial took place. Also, in light of the information that Mrs. Daniel provided trial counsel about Mr. Daniel's educational background, any reasonable investigation would have included an examination of his school records.[16] Mr. Daniel's second amended Rule 32 petition pleaded that counsel "would have been able to show the jury that Mr. Daniel's cognitive difficulties extended far beyond" ADHD and dyslexia had trial counsel obtained Mr. Daniel's school records. Beyond that, Mr. Daniel pleaded his school records revealed:

> 132. When Mr. Daniel was thirteen years old, he was referred to the Department of Student Services of the Birmingham Public School system to determine how best to educate him. Prior to this time, Mr. Daniel had been placed in special classes, transferred back into regular classes and re-enrolled in special classes after it became apparent that he could not keep up with his peers. According to the assessment made by the Guidance Department of the Birmingham

---

[16] That trial counsel could have gotten Mr. Daniel's school records with little effort is demonstrated by the fact that postconviction counsel pleaded they "obtained readily available documents through simple requests made by mail from institutions that Mr. Daniel had attended before the age of 18." Mr. Daniel attached his school records to his second amended Rule 32 petition.

Public School system . . . , Mr. Daniel's school referred him to the Department of Student Services for the following reasons:

> Renard has poor reading and mathematics skills. Behavioral observations made by the teacher suggest that he is distractible, disruptive, over-active, and exhibits bizarre behavior (laughs for no reason). Information received from the school indicates that Renard's learning difficulty is being addressed via Basic Skills services. It is also indicated that he has been placed with another teacher but no improvement has been evidenced.

133. A test administered to assess his academic achievement revealed that Mr. Daniel's reading comprehension was that of a student at the beginning of second grade and "severely deficient." The test further revealed that Mr. Daniel's mathematical ability was at also at a second grade level and also "severely deficient." Finally, the test indicated that Mr. Daniel's written language skills were at a high first grade level and "severely deficient" for his grade. . . .

134. The psychological evaluation prepared by the Birmingham Public Schools Guidance Department concluded that Mr. Daniel appeared to be "experiencing nonverbal and verbal comprehension difficulties," and that he might "learn verbal skills at a much slower rate and retain less knowledge than the average child."

135. The Guidance Department assessment further reveals that Mr. Daniel's results on an intelligence test administered by the Public School system when Mr. Daniel was in sixth grade indicated that he was within the "[b]orderline classification of intelligence."

****

140. While he was in the sixth grade in 1988, Mr. Daniel's intellectual functioning was assessed according to the Wechsler Intelligence Scale for Children–Revised (the "WISC-R") and the Slosson Intelligence Test. Mr. Daniel's IQ was measured at 77 on the WISC-R and 70 on the Slosson Intelligence Test.

(Internal citations omitted.)

31

We conclude that Mr. Daniel pleaded sufficient facts in his second amended Rule 32 petition to show that trial counsel's failure to obtain his school records was deficient under the totality of circumstances of his case and under prevailing professional norms.

Mr. Daniel's trial counsel, like the trial counsel in Wiggins, "abandoned their investigation of [Mr. Daniel's] background after having acquired only rudimentary knowledge of his history from a narrow set of sources," thereby making the investigation itself unreasonable. 539 U.S. at 524, 123 S. Ct. at 2537; see also Williams, 529 U.S. at 369, 395, 120 S. Ct. at 1500, 1514; Cooper v. Sec'y, Dep't of Corr., 646 F.3d 1328, 1351–52 (11th Cir. 2011) (finding deficient performance based on inadequate investigation where trial counsel interviewed the defendant, his mother, and a clinical psychologist, but not others). Because Mr. Daniel's trial counsel failed to conduct a minimally adequate mitigation investigation, they "were not in a position to make a reasonable strategic choice as to whether" to conduct further investigation, Wiggins, 539 U.S. at 536, 123 S. Ct. at 2543, or to conclude that further investigation "would be fruitless or even harmful." Strickland, 466 U.S. at 691, 104 S. Ct. at 2066. It is important to Mr. Daniel's case that this record includes nothing to indicate that trial counsel's limited investigation into Mr. Daniel's troubled family background was the product of reasonable professional judgment. See Burger v. Kemp , 483 U.S. 776, 794–95,

32

107 S. Ct. 3114, 3126 (1987). To the contrary, during oral argument in this Court, the state confirmed that there was no evidence or indication in this record "that trial counsel uncovered in their investigation something that would make them not want to go forward, that might be unhelpful or counterproductive." In summary, Mr. Daniel pleaded sufficient facts to overcome the presumption that trial counsel's inactivity in this case was strategically defensible based on the totality of the state court record.

Our conclusion that Mr. Daniel's second amended Rule 32 petition pleaded sufficient facts to show that trial counsel failed to conduct a minimally adequate mitigation investigation implicates counsel's deficient performance with respect to all aspects of counsel's investigation, development, and presentation of Mr. Daniel's penalty phase defense. For example, because trial counsel failed to get Mr. Daniel's school records or otherwise follow up on the information they learned from Mrs. Daniel, it is not surprising that trial counsel was not able to give the trial court relevant and necessary information to support their motion for a mental health evaluation. This was the motion made by trial counsel on the first day of Mr. Daniel's trial. On this record, we conclude that Mr. Daniel's second amended Rule 32 petition pleaded sufficient facts to show trial counsel performed deficiently in failing to secure the assistance of a mental health expert to assist with Mr. Daniel's defense during the penalty phase.

In fact, after reviewing the results of intelligence testing performed on Mr. Daniel in his school records, postconviction counsel hired Drs. Daniel Marson and Kristen Triebel (both affiliated with the University of Alabama at Birmingham) to prepare a neuropsychological assessment of Mr. Daniel. Mr. Daniel attached the neuropsychological report of Drs. Marson and Triebel to his second amended Rule 32 petition and affirmatively pleaded that both doctors "live in Alabama and would have been available to testify at Mr. Daniel's trial." This report concluded, among other things: that Mr. Daniel's "[h]istorical and current intelligence testing were most consistent with borderline intellectual functioning"; that he likely suffered from "childhood dissociative disorder with psychotic features" as a result of daily sexual, physical, and emotional abuse;[17] that he has "[s]ignificant impairments in adaptive functioning both prior to and after age 18"; that he has "[c]urrent

---

[17] The neurological evaluation noted that Mr. Daniel's childhood dissociative disorder was corroborated by his educational records:

> It appears that the level of psychological trauma was overwhelming and one way that Mr. Daniel coped as a young boy was through dissociative creation of a private mental world called "happy land" populated by talking animals and laughing clowns whom he would converse with. He reported that he learned to escape to "happy land" for many hours at a time and that his sisters would comment about him staying in his room and his talking to himself. Mr. Daniel also indicated that he often would continue on mentally in "happy land" when in school, and would not be in touch with activities in the classroom. Educational records corroborate that bizarre behavior was noted by teachers in the classroom in the form of "[he] laughs for no reason."

Thus, beyond providing reason to further investigate Mr. Daniel's intellectual deficits, the school records document a history of bizarre behavior supporting the need for at least some minimal investigation into Mr. Daniel's mental health.

34

cognitive deficits in verbal memory, auditory working memory, and executive function"; and that he likely "suffered from depression since childhood."

After reviewing Mr. Daniel's school records, a reasonable attorney would have discovered the results of Mr. Daniel's childhood intelligence testing. Armed with this evidence, a reasonable attorney would have been prompted to further investigate the extent of Mr. Daniel's cognitive impairments. A proper inquiry would not have been limited to whether Mr. Daniel was intellectually disabled under Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002), but would have looked to whether he is borderline intellectually disabled, as his school records indicate. That's because borderline intellectual disability that does not rise to the level of intellectual disability under Atkins is still itself powerful mitigation. See Williams, 529 U.S. at 398, 120 S. Ct. at 1515 ("[T]he reality that [Mr. Williams] was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability."); Wiggins 539 U.S. at 535, 123 S. Ct. at 2542 (noting that "diminished mental capacities" is among "the kind of troubled history . . . relevant to assessing a defendant's moral culpability.").

Considering that "[t]he intellectual-disability determination is fact-intensive, requiring careful consideration of the petitioner's intellectual functioning, adaptive skills, and age of onset, with the assistance of qualified experts," Conner v. GDCP Warden, 784 F.3d 752, 766 (11th Cir. 2015), a reasonable attorney in 2003 would

35

have at least asked for the appointment of qualified experts to explore Mr. Daniel's borderline intellectual disability. Mr. Daniel's trial counsel did not. And there is nothing in the record to refute that trial counsel could have retained Dr. Marsons or Dr. Triebel, or others with their expertise, to investigate and develop relevant and admissible mitigating evidence about Mr. Daniel's borderline intellectual disability and other childhood difficulties. We conclude that Mr. Daniel pleaded sufficient facts in his second amended Rule 32 petition to show his trial counsel were deficient for not exploring his borderline intellectual disability.

### b. Investigation of Prior Burglary Conviction

We have also reviewed the record regarding trial counsel's failure to investigate and challenge the state's characterization of Mr. Daniel's prior burglary conviction as a violent felony involving attempted rape. Mr. Daniel's second amended Rule 32 petition pleaded specific and sufficient facts to state a claim that trial counsel was deficient in that regard as well. During the penalty phase presentation to the jury, the state introduced documentary evidence that Mr. Daniel had a prior conviction for second degree burglary to prove the aggravating circumstance that he was previously convicted of a felony involving the use or threat of violence.[18] The state addressed the "nature" of Mr. Daniel's second

---

[18] Specifically, the state introduced three pieces of documentary evidence that Mr. Daniel was convicted of second degree burglary: (1) a case action summary indicating that Mr. Daniel pleaded guilty to second degree burglary; (2) a complaining witness affidavit stating that Mr.

36

degree burglary during its closing argument, emphasizing to the jury that it "was a violent offense" that involved "entering or remaining in someone's home for the purpose of committing rape."

Mr. Daniel's second amended Rule 32 petition specifically alleged that "[t]rial [c]ounsel's failure to investigate the circumstances surrounding [Mr. Daniel's burglary] conviction left the jury with exactly the impression that the State wanted them to have"—"that Mr. Daniel was a habitually violent criminal, deserving of the death penalty." In support, the Rule 32 petition alleged trial counsel "had statutory notice of the aggravating circumstances on which the State could rely." The petition also pleaded that trial counsel had a "duty to investigate the circumstances of Mr. Daniel's prior convictions that could be used as statutory aggravators under" Rompilla. Mr. Daniel alleged the records of his prior burglary conviction were "available in the same courthouse as his capital murder trial and . . . even a cursory review of these records would have led [t]rial [c]ounsel to investigate the circumstances surrounding Mr. Daniel's conviction."

Noting that government records describing his burglary conviction did not mention the word "rape," Mr. Daniel alleged that "[t]rial [c]ounsel should have made some effort to discover how this element of the offense was added" to the

Daniel committed burglary in the second degree "with intent to commit a theft or a felony therein, to-wit: assault"; and (3) an indictment stating Mr. Daniel "did unlawfully enter the lawfully occupied dwelling house of Bonnie Stevenson, with intent to commit a theft or a felony therein, to-wit: Rape."

37

indictment. It is a fact that the word "rape" does not appear in the case action

summary, complaining witness affidavit, or plea agreement that Mr. Daniel signed.

Neither does the word "rape" appear in an August 1998 report of the Alabama

Board of Pardons and Paroles that described the details underlying Mr. Daniel's

second degree burglary conviction, as the Rule 32 petition noted.[19] Although the

second amended Rule 32 petition acknowledged that trial counsel objected to the

introduction of Mr. Daniel's burglary conviction, it described the following:

> [P]rior to the penalty phase, [t]rial [c]ounsel had never even looked at
> Mr. Daniel's record, much less prepared arguments that could be
> advanced to negate the impact of that record in the minds of the jury.
> Trial [c]ounsel's ignorance rendered it impossible for them to rebut
> effectively the State's aggravation case because, at the time of trial,
> [t]rial [c]ounsel was completely ignorant of the basis upon which that
> case would be built.

Besides the readily available legal records trial counsel failed to discover,

the Rule 32 petition alleged trial counsel "neither sought nor discovered" other

information that would have reduced the weight of the prior violent felony

---

[19] The Rule 32 petition quoted the Alabama Board of Pardon and Paroles's description of Mr. Daniel's burglary offense as follows:

> On 4-11-96 at 1228 Tuscaloosa Avenue, Apartment 3, Birmingham, Alabama, the subject began pounding on the window of Apartment 3 and began to shout, "Open the window, I've got a gun." The subject then began to pull open a window which was nailed shut and attempted to gain entry into the residence. The victim's granddaughter observed the suspect as he attempted to enter the residence. The victim then entered the bedroom where the window is located and shouted that I have a gun also. The subject then left the residence running. Upon officers arriving on the scene, the granddaughter gave officers a description of the suspect. Based on the description, the subject was arrested after being spotted in the alley in the rear of 1229 Tuscaloosa Avenue.

aggravator.  Mr. Daniel alleged that trial counsel "did not make any effort to speak to Bonnie Stevenson, the complaining witness in the second degree burglary charge."  According to an interview of Ms. Stevenson conducted by postconviction counsel, "Mr. Daniel never even came close to physically or sexually assaulting her or any other member of her family . . . . To the contrary, for the duration of the incident, Mr. Daniel was standing outside a barred window and had no ability to access the apartment."

Finally, Mr. Daniel alleged that had trial counsel been aware of his guilty plea, "which they clearly were not," they would have been able to contact Cassandra Golden, the attorney who represented him in his prior burglary conviction.  The Rule 32 petition alleged that postconviction counsel interviewed Ms. Golden about the circumstances surrounding Mr. Daniel's plea and was told "that Mr. Daniel's plea did not involve any charge of attempted rape."  Indeed, Mr. Daniel specifically pleaded that his signed plea agreement "evince[d] his understanding []he had been indicted for distribution of a controlled substance, burglary and 'RSP'—not attempted rape."

The facts that Mr. Daniel alleged in his second amended Rule 32 petition were specific and sufficient to state a claim that, based on the totality of circumstances of his case, his trial counsel was deficient for failing to investigate and challenge the state's reliance on his second degree burglary conviction.  It is

39

well established that counsel "ha[s] a duty to make all reasonable efforts to learn what they [can] about [prior offenses]" upon which counsel knows the prosecution intends to rely in seeking the death penalty. Rompilla, 545 U.S. at 385–86, 125 S. Ct. at 2465. This includes "obtaining the [state's] own readily available file on the prior conviction to learn what the [state] knew about the crime, to discover any mitigating evidence the [state] would downplay, and to anticipate the details of the aggravating evidence the [state] would emphasize." Id. Trial counsel's "obligation to rebut aggravating evidence extended beyond arguing it ought to be kept out." Id. at 386 n.5, 125 S. Ct. at 2465 n.5. In Rompilla, the Supreme Court held that trial counsel's failure to investigate the circumstances of the defendant's prior conviction "fell below the level of reasonable performance" because trial counsel knew that the Commonwealth would use the defendant's prior conviction for rape and assault to establish Mr. Rompilla's history of violent felonies and it was "undisputed that the prior conviction file was a public document, readily available for the asking at the very courthouse where Rompilla was to be tried." Id. at 383–84, 125 S. Ct. at 2464.

Accepting Mr. Daniel's allegations as true—as Alabama courts do at the pleading stage—trial counsel unreasonably failed to inquire into the circumstances surrounding Mr. Daniel's prior second degree burglary conviction. This despite the fact that trial counsel was on notice that the state intended to argue that the

40

burglary conviction established an aggravating factor as a violent felony involving attempted rape, and that the records were readily available in the same courthouse where the capital trial took place. Had trial counsel made even a cursory review of government documents, they could have informed the jury that the record of Mr. Daniel's burglary conviction included no evidence that he ever came close to physically or sexually assaulting anyone.

2. The Unreasonableness of the State Court's Decision about Deficient Performance

In concluding that Mr. Daniel failed to plead his penalty phase ineffective assistance claim with sufficient specificity, the Alabama Court of Criminal Appeals primarily focused on Mr. Daniel's failure to plead "how he was prejudiced by counsel's failure to present evidence." See Daniel II, 86 So. 3d at 429. The Court of Criminal Appeals did not address whether trial counsel's investigation into his background was reasonable under prevailing professional norms. On this point, what we said in Williams v. Allen, 542 F.3d 1326 (11th Cir. 2008), is equally true here:

> The court appears to have assumed, based on the fact that [Mr. Daniel's] sentencing phase presentation included some evidence of abuse, that counsel's investigation was sufficient to permit a reasonable decision as to what evidence should be offered. However, "[i]n assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins, 539 U.S. at 527, 123 S. Ct. at 2538. As discussed above, we conclude that trial counsel

41

abandoned their investigation at an unreasonable point, particularly in light of the information about [Mr. Daniel's] background that the investigation revealed. By simply assuming that trial counsel's investigation was adequate, without considering the reasonableness of counsel's decision to limit the scope of their inquiry, the Alabama court unreasonably applied Strickland. See id. at 527–28, 123 S. Ct. at 2538.

Id. at 1341 (some citations omitted).

We further conclude that the Alabama Court of Criminal Appeals unreasonably applied clearly established Supreme Court precedent when it concluded that Mr. "Daniel failed to plead sufficient facts to support a Rompilla claim." Daniel II, 86 So. 3d at 440. In rejecting this claim, the Court of Criminal Appeals acknowledged that "Rompilla held that it was ineffective assistance of counsel for counsel at the penalty phase of Rompilla's capital trial to not investigate his prior conviction the State of Pennsylvania intended to rely on at the sentencing hearing." Id. at 439. But the Court of Criminal Appeals distinguished Rompilla, saying "the file of Rompilla's prior conviction contained a veritable cornucopia of potential mitigating evidence concerning Rompilla's childhood and mental illness." Id. Because Mr. Daniel did not plead "such information existed" in the file of his prior conviction, the Court of Criminal Appeals held he failed to sufficiently plead a Rompilla claim. Id. at 439–40. The Court of Criminal Appeals also said the state did not emphasize the prior conviction and found that "counsel could have made a strategic decision to not call further attention to that conviction

42

by introducing specific details about the attempted burglary conviction." Id. at 439. This reasoning is contrary to or an unreasonable application of clearly established federal law.

Rompilla did not hold that prior conviction records must contain mitigating evidence in order to trigger counsel's duty to consult them. Rather, it held that counsel renders deficient performance if he fails to investigate readily available records, when he is on notice that the state intends to rely on prior convictions as aggravation. Rompilla, 545 U.S. at 385–86, 389, 125 S. Ct. at 2465, 2467 ("It flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking."); see also id. at 387, 125 S. Ct. at 2465 ("The notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense."). Defense counsel must be prepared to respond to the state's case in aggravation. Id. at 385, 125 S. Ct. at 2465 ("With every effort to view the facts as a defense lawyer would have done at the time, it is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation.").

And in any event, a finding that the state did not emphasize the prior conviction is unreasonable based on Mr. Daniel's state court record in three ways.

43

First, it ignores that documentary exhibits related to the burglary conviction were the only new evidence introduced by the state during the penalty phase. Second, it ignores that the state's closing argument stressed that Mr. Daniel had three aggravating circumstances, including "entering or remaining in someone's home for the purpose of committing rape." Third, that the state may not have presented any evidence about the details of his prior burglary does nothing to diminish the fact that the actual circumstances as alleged by Mr. Daniel's Rule 32 petition were far less aggravating than what the jury heard.

Finally, saying "counsel could have made a strategic decision" in order to avoid calling further attention to the prior burglary conviction is an unreasonable application of clearly established federal law and an unreasonable determination of the facts in light of the record and Mr. Daniel's allegations. Trial counsel's decision cannot be characterized as strategic when it was not the result of a reasonable investigation into the circumstances of Mr. Daniel's prior conviction. Id. at 396, 125 S. Ct. at 2471 ("Strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation." (quotation omitted and alteration adopted)). Mr. Daniel has sufficiently alleged that his trial counsel's failure to challenge the state's characterization of his prior burglary as a violent felony involving intent to commit rape was not a decision resulting from an

44

adequate investigation.  Under <u>Rompilla</u>, it is clear that no reasonable professional judgment supported counsel's failure to conduct this investigation.  Thus, Mr. Daniel has sufficiently pleaded that counsel's decision to conduct no investigation into the nature of his prior burglary conviction and to mount no challenge to the state's characterization of it could not have been strategic.

## B. PREJUDICE UNDER <u>STRICKLAND</u>

In order for Mr. Daniel to show that he was prejudiced by counsel's deficient performance, he must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  <u>Strickland</u>, 466 U.S. at 694, 104 S. Ct. at 2068.  "[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case."  <u>Id.</u> at 693, 104 S. Ct. at 2068.  When evaluating the reasonable probability of a different result in a capital sentencing proceeding, "we consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'"  <u>Porter</u>, 558 U.S. at 41, 130 S. Ct. at 453–54 (quoting <u>Williams</u>, 529 U.S. at 397–98, 120 S. Ct. at 1515).  Mr. Daniel was not required to prove he was prejudiced at the pleading stage under Rule 32, and in

45

reviewing the sufficiency of his allegations, we take his factual allegations as true.

See Williams, 651 So. 2d at 572–73.

1.  The Sufficiency of Mr. Daniel's Second Amended Rule 32 Petition Allegations Regarding Prejudice

Mr. Daniel's second amended Rule 32 petition specifically pleaded that trial

counsel's deficient performance during the penalty phase prejudiced him as

follows:

> 192. Trial [c]ounsel's absolute and admitted lack of preparation for the penalty phase all but ensured that Mr. Daniel's constitutional rights would be violated.  As a result of [t]rial [c]ounsel's gross ineffectiveness, the jury never heard of the chronic physical and sexual abuse Mr. Daniel suffered at the hands of Mrs. Daniel's second husband, despite obvious indications of the presence of such evidence. The jury also never heard that Mrs. Daniel shot and killed Mr. Daniel's father when Mr. Daniel was only three years old, or that she was incarcerated for this crime, or that Mr. Daniel witnessed his father's death as a toddler.  The picture [t]rial [c]ounsel painted for the jury of Mr. Daniel's mental capacity through Mrs. Daniel's testimony was also woefully incomplete.  The jury never heard of the chronic problems that Mr. Daniel had in school, and was unaware that he had been diagnosed with borderline intelligence by state officials at a young age and likely suffered from mental retardation.  Nor did the jury hear that Mr. Daniel's mother was formally diagnosed with manic depression, a bipolar disorder that is known to run in families, or that Mr. Daniel currently suffers from auditory and visual hallucinations as a result of his childhood trauma.  The jury heard no evidence concerning Mr. Daniel's long and troubled history of addiction or his nonviolent character, and was left with the impression that he came close to committing the heinous crime of rape.

> 193. Had available mitigating evidence been presented, there exists a reasonable probability that Mr. Daniel would have been sentenced to life without possibility of parole. See Wiggins, 539 U.S. at 536 (noting that "had the jury been confronted with this considerable

mitigating evidence, there is a reasonable probability that it would have returned with a different sentence"); see also Collier, 177 F.3d 1184 (failure to present the available evidence of defendant's upbringing, compassion, his poverty, and gentle disposition rendered performance ineffective); Harris v. Dugger, 874 F.2d at 756 (because the jury knew little about defendant including the fact that family members described defendant as a devoted father, husband, and brother, counsel was ineffective); Armstrong v. Dugger, 833 F.2d at 1434 (finding the "demonstrated availability of undiscovered mitigating evidence clearly met the prejudice requirement" under Strickland); Blanco, 943 F.2d at 1505 (finding a "reasonable probability" that ''jury might have recommended a life sentence'' had counsel presented the mitigating evidence that would have been available "had they more thoroughly investigated"). But for [t]rial [c]ounsel's errors, there is a reasonable probability that the jury would have recognized a very different balance of aggravating and mitigating circumstances. See Strickland, 466 U.S. at 687.

Beyond these paragraphs taken verbatim from Mr. Daniel's second amended Rule 32 petition, any fair reading of his Rule 32 petition and its supporting exhibits includes many details about Mr. Daniel's background and character that were never discovered by trial counsel. We have quoted many of those details already, such as Mr. Daniel's childhood sexual abuse and borderline intellectual functioning, and need not repeat them here.

We hold that Mr. Daniel's second amended Rule 32 petition pleaded sufficient facts to show prejudice under Strickland and its progeny. The Supreme Court has told us repeatedly that a failure to conduct a mitigation investigation is prejudicial under circumstances where, as here, such an investigation would have uncovered an "excruciating life history." Wiggins, 539 U.S. at 537, 123 S. Ct. at

47

2543; see also Rompilla, 545 U.S. at 391–93, 125 S. Ct. at 2468–69; Williams, 529 U.S. at 395–96, 120 S. Ct. at 1514–15.  Evidence of the nature Mr. Daniel's trial counsel failed to discover and present at his trial is constitutionally relevant because "defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." Penry, 492 U.S. at 319, 109 S. Ct. at 2947 (quotation omitted).  Social history evidence like Mr. Daniel's "ha[s] particular salience for a jury," so omitting it from capital sentencing proceedings may be especially prejudicial.  Porter, 558 U.S. at 43, 130 S. Ct. at 455; see also Rompilla, 545 U.S. at 391–93, 125 S. Ct. at 2468–69; Wiggins, 539 U.S. at 535, 123 S. Ct. at 2542; Williams, 529 U.S. at 398, 120 S. Ct. at 1515–16.

Several factors support our conclusion that Mr. Daniel's second amended Rule 32 petition alleged sufficient facts to establish a reasonable probability that the jury would have struck a different balance in weighing the aggravation against the totality of mitigation in his case.  First, the Supreme Court has recognized that evidence of impaired intellectual functioning or adaptive functioning is "inherently mitigating," Tennard v. Dretke, 542 U.S. 274, 287, 124 S. Ct. 2562, 2571 (2004), because "our society views [intellectually disabled] offenders as categorically less culpable than the average criminal." Atkins, 536 U.S. at 316, 122 S. Ct. at 2249.

48

Second, both the Supreme Court and this Court have recognized the long-lasting effects child sexual abuse has on its victims.  See Kennedy v. Louisiana, 554 U.S. 407, 435, 128 S. Ct. 2641, 2658 (2008); United States v. Irey, 612 F.3d 1160, 1207 (11th Cir. 2010) (en banc).  For example, in deciding that the death penalty could not be imposed for the rape of a child, the Supreme Court in Kennedy acknowledged that:

> Here the victim's fright, the sense of betrayal, and the nature of her injuries caused more prolonged physical and mental suffering than, say, a sudden killing by an unseen assassin.  The attack was not just on her but on her childhood. . . . Rape has a permanent psychological, emotional, and sometimes physical impact on the child.  We cannot dismiss the years of long anguish that must be endured by the victim of child rape.

544 U.S. at 435, 128 S. Ct. at 2658 (citations omitted).

Third, even without the substantial and compelling mitigation that trial counsel failed to discover and present, Mr. Daniel's jury voted 10 to 2 for death based on the brief testimony of his mother.  Under Alabama law, if one more juror voted for a sentence of life without parole, there could have been no recommendation for death.[20]  Ala. Code § 13A-5-46(f).

Fourth, while we recognize that trial counsel elicited some mitigation evidence of Mr. Daniel's troubled childhood, this does not mean trial counsel's

---

[20]  In Alabama, a jury verdict for life without parole "must be based on a vote of a majority of the jurors," but a jury verdict for death "must be based on a vote of at least 10 jurors."  Ala. Code § 13A-5-46(f).  If the jury is unable to reach a verdict as to sentence, the trial court is authorized to declare a mistrial.  Id. § 13A-5-46(g).

49

deficient performance caused no prejudice. The Supreme Court has "never limited the prejudice inquiry under Strickland to cases in which there was only 'little or no mitigation evidence' presented." Sears, 561 U.S. at 954, 130 S. Ct. at 3266. Here, the nature, quality, and volume of the mitigation never known to the jury is significant enough to conclude that it "bears no relation" to the cursory evidence that trial counsel presented. Rompilla, 545 U.S. at 393, 125 S. Ct. at 2469; see also Williams, 529 U.S. at 399, 120 S. Ct. at 1516; Ferrell v. Hall, 640 F.3d 1199, 1236 (11th Cir. 2011). While the jury heard from Mrs. Daniel that her son had ADHD and dyslexia, the jury never heard that Mr. Daniel had been found to be borderline intellectually disabled—a fact that could easily have been established through his school records or expert testimony. The cursory testimony that Mr. Daniel has dyslexia and ADHD does not begin to describe his borderline intellectual disability or his significant impairments in adaptive functioning. In the same way, Mrs. Daniel's telling of one specific instance of abuse, albeit severe, did not give the jury a true picture of the chronic physical, emotional, and sexual abuse that Mr. Daniel suffered in his critical developmental years. Notably, there was nothing at all said during the penalty phase about the sexual abuse Mr. Daniel suffered as a child.

Finally, on the aggravating side of the ledger, "the weight of the evidence in aggravation is not as substantial as the sentencing judge [and jury] thought."

50

Porter, 558 U.S. at 41, 130 S. Ct. at 454.  As we've said, trial counsel was deficient for failing to investigate the details of Mr. Daniel's second degree burglary conviction, which the state relied on to establish the aggravating circumstance that the defendant had a prior conviction for a crime involving the threat of violence. Because the jury was never told that Mr. Daniel did not enter the home of the purported victim, it was left with the impression that Mr. Daniel committed a burglary with the intent to commit rape.  Rape is, of course, highly inflammatory, so unrebutted evidence that Mr. Daniel tried to rape someone is highly prejudicial. If trial counsel had looked into this earlier, they would have known that only the indictment (and not the guilty plea, sentencing order, or parole documents) mentioned intent to commit rape.

Beyond the public records, if trial counsel had interviewed the complaining witness or the attorney who represented Mr. Daniel in the burglary case, they would have learned that Mr. Daniel never went into the home of the complaining witnesses and thus had no physical contact with anyone.  Indeed, the evidence indicates that Mr. Daniel yelled outside a barred window of the home and then promptly fled when the occupant threatened that she had a gun.  Mr. Daniel's conduct that gave rise to his burglary conviction was, of course, bad and wrong, but not as egregious as the jury was led to believe.  This matters because in Rompilla, the Supreme Court concluded that because the "sentencing jury was

51

required to weigh aggravating factors against mitigating factors," a court "may reasonably assume that the jury could give more relative weight to a prior violent felony aggravator where defense counsel missed an opportunity to argue that circumstances of the prior conviction were less damning than the prosecution's characterization of the conviction would suggest." Rompilla, 545 U.S. at 386 n.5, 125 S. Ct. at 2465 n.5.

2. The Unreasonableness of the State Court's Decision about Prejudice

Since we have determined that Mr. Daniel's second amended Rule 32 petition pleaded sufficient facts to show prejudice under Strickland, we must consider whether the Alabama Court of Criminal Appeals's contrary decision was an unreasonable application of federal law under § 2254(d). We conclude that it was. The Court of Criminal Appeals's conclusion that Mr. Daniel's second amended Rule 32 petition failed to plead how he was prejudiced was contrary to, and an unreasonable application of, clearly established Supreme Court precedent.

To begin, the Court of Criminal Appeals unreasonably failed to consider the prejudicial effect of trial counsel's deficient performance based on the "totality of available mitigating evidence," as established Supreme Court precedent clearly requires. Wiggins, 539 U.S. at 534, 123 S. Ct. at 2542. The Court of Criminal Appeals broke up Mr. Daniel's penalty phase ineffective assistance of counsel claim into different subparts, then analyzed them separately. See Daniel II, 86 So.

3d at 428–40; see also Coral, 900 So. 2d at 1284 (noting "the claim of ineffective assistance of counsel is a general allegation that often consists of numerous specific subcategories"). For example, the Court of Criminal Appeals considered Mr. Daniel's allegations concerning his child abuse, sexual abuse, borderline intellectual disability, his mother's murder of his father, poverty, depression, and other undiscovered and unpresented mitigating evidence each in isolation. Daniel II, 86 So. 3d at 428–40. In doing so, the Court of Criminal Appeals never considered what would be the combined effect of all mitigating evidence in producing a different outcome at sentencing. But it is the reweighing of the totality of mitigating evidence that is important for reweighing under Strickland. Williams v. Taylor dictates that a state court's prejudice determination is "unreasonable insofar as it fail[s] to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." 529 U.S. at 397–98, 120 S. Ct. at 1515.

Independent of the state court's failure to weigh the totality of mitigating evidence in its determination of prejudice, we also conclude that the Alabama Court of Criminal Appeals unreasonably applied Supreme Court precedent when it failed to give any consideration to the mitigating effect of Mr. Daniel's borderline intellectual functioning. With regard to his intellectual function, the Court of

53

Criminal Appeals evaluated only whether Mr. Daniel had proved he was ineligible for the death penalty under Atkins. See Daniel II, 86 So. 3d at 431–34. It therefore concluded that trial counsel was not ineffective "for failing to explore the possibility that [Mr.] Daniel was mentally retarded and thus ineligible for the death penalty."[21] Id. at 431; see also id. at 434. But the gravamen of Mr. Daniel's claim

---

[21] The Court of Criminal Appeals's opinion makes clear that the court evaluated Mr. Daniel's ineffective assistance claim solely as a claim about the failure to investigate whether Mr. Daniel was eligible for the death penalty under Atkins. The Court of Criminal Appeals found that Mr. Daniel failed to plead sufficient facts to support an Atkins claim and thus concluded that trial counsel was not "ineffective for failing to explore the possibility that [Mr.] Daniel was mentally retarded." Daniel II, 86 So. 3d at 431; see also id. at 434. The only part of the opinion that could conceivably be read to address Mr. Daniel's borderline intellectual disability claim are the last two sentences in the section of the opinion dealing with Atkins. These sentences note that trial counsel did not believe that a full mental evaluation was necessary based on conversations with Mr. Daniel and because Mr. Daniel had never been treated for any mental illness. See id. at 433–34. The fact that this comes at the end of a section spanning nearly three pages of analysis under the Atkins standard leaves little doubt that the court was not deciding Mr. Daniel's ineffectiveness claim regarding failure to investigate and present reasonably available mitigation evidence.

But even if we did read the Court of Criminal Appeals opinion to decide some kind of broader claim about failure to investigate and present other forms of mitigation evidence, there is no basis to find that adjudication reasonable. As we have already discussed, Mr. Daniel pleaded sufficient facts in his Rule 32 petition—which the Alabama Court of Criminal Appeals was required to accept as true—to show his trial counsel's performance was deficient based on the inadequacy of their investigation. Trial counsel completely failed to follow up on the many red flags revealed by their brief conversation with Mr. Daniel's mother, who told them about Mr. Daniel's attention deficit disorder, poor academic record, "problems learning," and his family's attempts to get him help at school. To the extent that the Court of Criminal Appeals implicitly concluded that trial counsel's performance was reasonable as to an ineffectiveness claim unrelated to Atkins, therefore, this was an unreasonable application of Strickland because the court did not consider the reasonableness of trial counsel's decision to limit the scope of their investigation. See Williams, 542 F.3d at 1341. Also, to the extent the Court of Criminal Appeals implicitly concluded that no prejudice resulted from trial counsel's failure to investigate, the court unreasonably discounted to irrelevance the mitigating evidence of Mr. Daniel's borderline intellectual functioning and other related mitigation evidence. See Porter, 558 U.S. at 42, 130 S. Ct. at 454. Indeed it didn't reweigh that evidence at all—it merely said Mr. Daniel did not prove he had a viable Atkins claim. It simply is not reasonable to deny an ineffectiveness

54

was mitigation, as opposed to ineligibility for the death penalty. After specifically describing the details of Mr. Daniel's school records and postconviction neurological assessment that would support a finding that he is borderline intellectually disabled, the Rule 32 petition pleaded:

> All of this readily available evidence could and should have been presented to the jury. As the United States Supreme Court has repeatedly held, evidence of Mr. Daniel's borderline intelligence would have been highly relevant to the jury's determination, in conjunction with the vast amount of other mitigating evidence that [t]rial [c]ounsel failed to investigate or present, and [t]rial [c]ounsel's failures in this respect amount[] to ineffective assistance of counsel. Wiggins, 539 U.S. at 516 (counsel ineffective for failing to investigate and present mitigating evidence including evidence regarding defendant's "limited intellectual capabilities"); Williams, 529 U.S. at 396 (failure to conduct investigation and failure to introduce, inter alia, evidence available to demonstrate defendant's 'borderline' mental retardation).[22]

Rather than address the borderline intellectual disability mitigation evidence that Mr. Daniel pleaded should have been investigated and presented, the Court of Criminal Appeals reformulated his claim, analyzed it as an Atkins claim, and then rejected it as such. For example, the Court of Criminal Appeals quoted the Rule 32 trial court's statements "in regard to [postconviction] counsel's claim that Daniel was mentally retarded." Daniel II, 86 So. 3d at 431. The Court of Criminal

---

claim for failure to investigate and present mitigation evidence solely because the petitioner has failed to show he is ineligible for the death penalty under Atkins.

[22] We also note that postconviction counsel sent the Rule 32 trial court a letter clarifying that Mr. Daniel was not asserting that he was intellectually disabled under Atkins.

55

Appeals then reviewed the Supreme Court's decision in <u>Atkins</u> and Alabama's definition for intellectual disability, which requires "an IQ of 70 or below." <u>Id.</u> at 432 (citing <u>Ex parte Perkins</u>, 851 So. 2d 453 (Ala. 2002)). In this process, the Court noted that Mr. Daniel "did not plead in his postconviction petition that his IQ was 70 or below." <u>Id.</u> at 433. As a result, the Court of Criminal Appeals held that Mr. "Daniel failed to plead sufficient facts to support an <u>Atkins</u> claim." <u>Id.</u>; <u>see also id.</u> at 434 ("To the extent that Daniel argues that counsel was ineffective for failing to explore the possibility that he is mentally retarded, there is no material issue of fact or law that would entitle Daniel to relief on this claim."). Because the Court of Criminal Appeals did not address Mr. Daniel's contentions with respect to his borderline intellectual disability, it failed to reweigh this critical mitigating evidence alongside all of Mr. Daniel's other mitigation, old and new. The state court's adjudication of <u>Strickland</u>'s prejudice prong was thus contrary to and an unreasonable application of clearly established Supreme Court precedent. <u>See</u> <u>Williams</u>, 529 U.S. at 397–98, 120 S. Ct. at 1515; <u>see also</u> <u>Porter</u>, 558 U.S. at 42, 130 S. Ct. at 454 (holding state court's conclusion that defendant was "not prejudiced by his counsel's failure to conduct a thorough . . . investigation" was unreasonable where state court "either did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction hearing").

56

## IV. DE NOVO REVIEW, DISCOVERY, AND EVIDENTIARY HEARING

Because we conclude that the Alabama Court of Criminal Appeals's adjudication of the merits of Mr. Daniel's penalty phase ineffective assistance of counsel claim was unreasonable under § 2254(d), we must review the merits of Mr. Daniel's claim de novo. Adkins, 710 F.3d at 1255. While we are persuaded that Mr. Daniel has stated a strong case for deficient performance and prejudice under Strickland and its progeny, we are reluctant to conduct de novo review "in the first instance because many of the factual allegations in Mr. [Daniel's] federal petition remain untested." Williams v. Alabama, 791 F.3d 1267, 1276 (11th Cir. 2015). As set out above, Mr. Daniel requested, but was never granted, an evidentiary hearing in state and federal court. As a result, Mr. Daniel "has never been afforded an opportunity to develop [his claimed] factual basis in the crucible of an evidentiary hearing—nor, just as importantly, has the State had the opportunity to challenge them in an adversarial hearing." Pope, 680 F.3d at 1294.

This analysis leads us to conclude that Mr. Daniel is entitled to an evidentiary hearing on his penalty phase ineffective assistance of counsel claim because he has alleged sufficient facts that, if true, would entitle him to habeas corpus relief. See Schriro v. Landrigan, 550 U.S. 465, 474, 127 S. Ct. 1933, 1940 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's

57

factual allegations, which, if true, would entitle the applicant to federal habeas relief."). To guide the District Court in conducting further proceedings in this case, we add the following observations. First, since we have determined the state court's adjudication of Mr. Daniel's penalty phase ineffective assistance of counsel claim was unreasonable based on the state court record, the District Court is no longer bound by § 2254(d) or limited to consideration of the facts developed in the state court record when evaluating the merits of Mr. Daniel's claim. See Madison v. Comm'r, Ala. Dep't of Corr., 761 F.3d 1240, 1250 (11th Cir. 2014) (explaining that nothing bars a district court from conducting an evidentiary hearing where "(1) the federal claim was adjudicated on the merits in state court; (2) there is a determination based only on the state court record that the petitioner has cleared the § 2254(d) hurdle; and (3) the habeas petitioner tried, but was not given the opportunity to develop the factual bases of the claim in state court within the meaning of 28 U.S.C. § 2254(e)(2)"), cert. denied sub nom. Madison v. Thomas, 135 S. Ct. 1562 (2015), reh'g denied, 135 S. Ct. 2346 (2015); see also Pope v. Sec'y, Fla. Dep't of Corr., 752 F.3d 1254, 1263 (11th Cir. 2014) (recognizing that, under Pinholster, a federal court may consider evidence not before the state court that rendered a merits decision when § 2254(d) is satisfied).

Second, although "[s]ection 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief," Pinholster, 563 U.S. at 185, 131 S.

58

Ct. at 1401, that provision bars the District Court from holding an evidentiary hearing only "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings," 28 U.S.C. § 2254(e)(2). But Mr. Daniel did not "fail" to develop the factual basis of his claims in state court through any omission, fault, or negligence that can fairly be attributed to him. See Williams, 529 U.S. at 432, 120 S. Ct. at 1488; see also Breedlove v. Moore, 279 F.3d 952, 960 (11th Cir. 2002) ("[A] petitioner cannot be said to have 'failed to develop' relevant facts if he diligently sought, but was denied, the opportunity to present evidence at each stage of his state proceedings."). To the contrary, the state court record shows Mr. Daniel was diligent in developing the factual basis of his claims in state court and we hold he "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." Williams, 529 U.S. at 435, 120 S. Ct. at 1490.

Third, Mr. Daniel filed a detailed motion for discovery in the District Court seeking access to a variety of records to substantiate his penalty phase ineffective assistance of counsel claim. He asked for records in the possession of trial counsel and various state agencies that he cannot access without a court order. The District Court denied Mr. Daniel's request for discovery in the same memorandum opinion finding that his habeas petition should be dismissed on the merits. Because we have determined that the state court's adjudication of Mr. Daniel's penalty phase

59

ineffective assistance of counsel claim is not entitled to deference under § 2254(d) and that Mr. Daniel pleaded sufficient facts that, if true, entitle him to habeas relief and an evidentiary hearing, we vacate the District Court's order denying him discovery.

The District Court denied discovery based on its finding that Mr. Daniel's claims lacked merit—a conclusion contrary to this opinion with respect to Mr. Daniel's penalty phase ineffective assistance of counsel claim.  On remand, the District Court should provide Mr. Daniel an opportunity to renew his discovery motion or file a new one in light of this opinion.  Although a habeas petitioner is not entitled to discovery as a matter of course, petitioners are entitled to discovery upon showing "good cause."  Bracy v. Gramley, 520 U.S. 899, 904, 117 S. Ct. 1793, 1796–97 (1997).  Good cause is demonstrated "where specific allegations . . . show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief."  Id. at 908–09, 117 S. Ct. at 1799 (quoting Harris v. Nelson, 394 U.S. 286, 300, 89 S. Ct. 1082, 1091 (1969)).  Although the particular facts of this case suggest good cause exists to warrant discovery, we recognize that Habeas Corpus "Rule 6(a) makes it clear that the scope and extent of such discovery is a matter confided to the discretion of the District Court."  Id. at 909, 117 S. Ct. at 1799.

60

## V.  CONCLUSION

We vacate the District Court's order denying Mr. Daniel's penalty phase ineffective assistance of counsel claim and its order denying discovery and an evidentiary hearing on this claim.  We affirm the District Court's denial of habeas relief on Mr. Daniel's guilt phase ineffective assistance of counsel claim.  We remand this case to the District Court to reconsider Mr. Daniel's discovery motion and to conduct an evidentiary hearing on his penalty phase ineffective assistance of counsel claim.  After the evidentiary hearing has been conducted, the District Court is directed to reconsider Mr. Daniel's penalty phase ineffectiveness claim de novo.

**REVERSED IN PART; AFFIRMED IN PART; VACATED AND REMANDED.**