[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-12133
_____

D.C. Docket No. 5:16-cv-00473-RDP

JAMES EDWARD BARBER,

Petitioner - Appellant,

versus

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(June 25, 2021)

Before JILL PRYOR, GRANT and BRANCH, Circuit Judges.

PER CURIAM:

In this capital case, James Edward Barber appeals the district court's denial of his federal habeas petition. Barber was sentenced to death in Alabama for the murder of his erstwhile girlfriend's elderly mother. Following an unsuccessful direct appeal and collateral proceedings in the Alabama state courts, Barber filed a federal habeas petition in the United States District Court for the Northern District of Alabama; the district court denied the petition. Barber appeals the rejection of his petition, contending that his trial counsel were constitutionally ineffective in investigating and presenting to the jury a case in mitigation of the death penalty. After a thorough review of the briefing and the record, and with the benefit of oral argument, we affirm the denial of Barber's petition.

## I.

Barber was convicted in Alabama of murder that was made capital because it was committed during a robbery. *See Barber v. State*, 952 So. 2d 393, 400 (Ala. Crim. App. 2005). A jury voted 11 to 1 to recommend a death sentence, and the trial court accepted the recommendation. *Id.* For purposes of this appeal, we assume trial counsel performed deficiently and that our review of prejudice to Barber is *de novo*. Because we make these "simplifying assumptions in favor of" Barber, *Castillo v. Fla., Sec'y Dep't of Corr.*, 722 F.3d 1281, 1283 (11th Cir. 2013), we recount only those facts from Barber's trial, sentencing, and postconviction proceedings that are necessary to decide this appeal.

2

## A. Facts Elicited at Trial

The trial court's summary of facts, which the Alabama Court of Criminal Appeals (CCA) adopted on direct appeal, was as follows:

Dorothy Epps was seventy-five years old at the time of her death, weighed approximately 100 pounds, and was 5 feet 5 inches tall. She was murdered on or about May 20th or May 21st, 2001, at her home in Harvest, Alabama.

The Defendant knew Mrs. Epps during her lifetime, had done repair work at the Epps home, and had had a social relationship with one of Mrs. Epps' daughters. There was no evidence of a forced entry by the Defendant into the Epps home, and it is more likely than not that the Defendant gained access to the home easily because of his acquaintance with Mrs. Epps.

Based upon the physical evidence presented including photographs of Mrs. Epps, before and during the autopsy, photographs of the area of the home where Mrs. Epps' body was found, and based upon the videotaped confession of the Defendant, the Defendant first struck Mrs. Epps in the face with his fist, and at some point thereafter, obtained a claw hammer that he used to cause multiple blunt force injuries to Mrs. Epps which caused her death.

Dr. Joseph Embry, a medical examiner with the Alabama Department of Forensic Sciences, testified as to his findings from the autopsy he performed on May 23rd, 2001.

Dr. Embry's examination of the body of Dorothy Epps showed injuries that he classified in several different categories: bruises, cuts and fractures, bleeding over the brain, multiple injuries in hand and arms, rib fractures and bruising in the front of her body, and bruising and rib fractures in the back of the body.

Dr. Embry found evidence of nineteen different lacerations in the head and seven fractures in the head or skull, injuries to the neck and mouth and left eye caused by blows to Mrs. Epps by the Defendant's

fists, and her tongue was bruised and injured from a blow or blows to the head.

Numerous defensive wounds were found by Dr. Embry, which were obviously inflicted upon Mrs. Epps in her effort to try to ward off the blows. She had bruising in her left palm and forearm, and bruising and injuries to the backs of her hands.

Mrs. Epps also suffered abdominal and lower chest bruising and she had fractures of her ribs in those areas. The wounds and injuries suffered by Mrs. Epps were consistent with those that would have been inflicted with a claw hammer, according to Dr. Embry.

Based upon his examination and his experience and training, Dr. Embry testified that the cause of death of Mrs. Epps was multiple blunt force injuries as depicted and described in his testimony, including the photographs that were admitted into evidence.

It is obvious from the testimony and the photographs that the injuries to Mrs. Epps, inflicted by the Defendant with a claw hammer, occurred over several areas of the part of the house where she was found. It is also clear from the evidence presented and from the photographs that Mrs. Epps was at times facing her attacker, that she was aware of what was happening at the hands of the Defendant. It is also clear that she made efforts to protect herself and get away from the blows being inflicted by the Defendant, and that she suffered great pain and mental anguish at the hands of the Defendant as he was attempting to inflict the blows with the claw hammer that ultimately resulted in her death.

Dr. Embry also testified unequivocally that Mrs. Epps would have been conscious when she received the defensive wounds and injuries as depicted in the photographic evidence.

*Barber*, 952 So. 2d at 401–02. The jury also heard "that there were blood spatters from Mrs. Epps' wounds all around the area where she was found, that there was a good deal of blood on the floor, walls, furniture, and ceiling in the area where she was found." *Id.* at 402. And the jury heard that there were bloody footprints on

Epps' back. *Id.* at 403. Investigators discovered a bloody palm print at the scene, and a latent print examiner from the Huntsville Police Department who examined the print testified that the print belonged to Barber. *See id.* at 402.

Upon his arrest, Barber confessed, "admitting that he struck Mrs. Epps with a claw hammer, grabbed her purse, and ran out of the house." *Id.* He told investigators he had been using cocaine all day on the day of the murder, did not plan to kill Epps, and was remorseful for having done so. *Id.* at 404–05. The jury saw a videotape of the confession.

The jury found Barber guilty. *See id.* at 400.

## B. Sentencing Proceedings

At the sentencing phase, the State called two witnesses to testify. Epps' husband of 52 years, George Epps, testified that his wife's murder was "absolutely devastating" to his family. Doc. 15-12 at 10–12.[1] Investigator Dwight Edger, who took Barber's confession and investigated the crime, testified that Epps' death was especially heinous, atrocious, and cruel as compared to the approximately two dozen other capital cases he had been involved in. He told the jury he believed Barber "took up close and personal a hammer and slaughtered this victim repeatedly with blows to her body for no other reason than to take what small amount of money he could get to purchase drugs with." *Id.* at 17.

---

[1] "Doc." numbers refer to the district court's docket entries.

Defense counsel presented four witnesses in mitigation.  Barber's brother and mother testified that Barber was a loving family member who began using drugs and alcohol at an early age, around 12 or 13.  A minister who worked at the jail testified that Barber had become a Christian and was an active participant in worship service.  He testified that others incarcerated in the jail looked up to Barber.

Dr. Marianne Rosenzweig, a clinical and forensic psychologist, testified as an expert witness.  Rosenzweig reviewed investigative and forensic materials from the case, interviewed Barber for about 3.5 hours, and interviewed five other people:  Barber's mother, two brothers, former employer, and an official at the jail where Barber was housed.  Rosenzweig testified about Barber's childhood, adolescence, and adulthood; his relationship with cocaine, his substance abuse diagnoses, and the behavioral effects of his cocaine use; the effect his cocaine use had, in her opinion, on the murder; and his adjustment to a carceral environment.

Of Barber's childhood, Rosenzweig testified that he was the fifth of seven children whose parents remained married.  She testified that the family lived in an upper working class neighborhood and that Barber's parents "were good parents," although "with seven children . . . the children often don't get as much individual attention."  Doc. 15-12 at 36.  Rosenzweig reported that Barber "had basically a happy childhood with one exception, that he was overweight when he was a child

6

and he was teased a lot by other kids," resulting in low self-esteem. *Id.* Barber made "above average grades" in school and only got in "minor kinds" of trouble at home. *Id.* at 37.

Of Barber's adolescence, Rosenzweig testified that he began to experiment with marijuana around age 13, started using "any kind of pills that he could get his hands on" by age 15 or 16, and was smoking marijuana daily by age 16 or 17. *Id.* In her opinion, Barber was biologically predisposed to substance abuse. She cited a "strong family history of substance abuse problems" and noted that of the seven Barber children, five had problems with substance usage at some point or another. *Id.* at 60. Rosenzweig reported that Barber "started to hang out with the kids who could be described as a partying-type crowd, who used alcohol, drugs," and that he quit school in 12th grade to move to Florida to work construction with one of his brothers. *Id.* at 37–38.

Of his adulthood leading up to the crime, Rosenzweig testified that Barber first used cocaine around age 20 and started using it "quite heavily" when he began making good money at his job. *Id.* at 41. Around this time, he stopped using marijuana and primarily used alcohol and cocaine. Although he was known for his good demeanor "when he was not high on substances," *id.* at 39, when he was high, his personality changed—"obnoxious was the word [she] heard over and over again," *id.* at 42. He had romantic relationships, but they fell apart because of his

7

substance abuse.  He had become somewhat violent with family members, once punching his younger brother and once punching his 13-year-old nephew in the back when his nephew commented that he was staggering.  He was arrested for slapping Liz Epps, the victim's daughter.  Nonetheless, Rosenzweig reported, Barber maintained a loving relationship with his parents and cared for them when his father was ill with cancer.

Rosenzweig reported that Barber would sometimes "stay high for about three, four days" with little sleep.  *Id.* at 41.  Most of the money he made went to drugs, and he often stole or borrowed money from friends to buy drugs.  He used cocaine heavily for about 10 years, was sober for about a year, and then relapsed after an injury that led him from pain pills back to cocaine.  At the time of Epps' death, Rosenzweig reported, Barber was using "about three to four hundred dollars' worth of crack cocaine a week and had also resumed his use of alcohol" a few weeks earlier.  *Id.* at 46.

Rosenzweig opined that Barber qualified for the diagnoses of cocaine abuse and alcohol abuse and that he probably met the diagnoses for cocaine and alcohol dependency.  She discussed the effects of large amounts of cocaine, including anxiety, agitation, irritability, confusion, and paranoia (possibly accompanied by hallucinations).  She also discussed the effects of cocaine withdrawal, which she said produced similar symptoms.  And she discussed the behavioral effects of

8

chronic crack cocaine use, including paranoia, impaired thinking, and "[m]oral degradation," which includes stealing and culminates in a "total declining from the person they were," essentially, "rock bottom." *Id.* at 55–56. This "rock bottom," Rosenzweig testified, is characterized by suicidal ideation, loss of relationships, "intense paranoia," and "[b]izarre behavior." *Id.* at 56. Rosenzweig opined that Barber was at rock bottom when he killed Epps.

Rosenzweig testified further that she had knowledge of similar crimes coinciding with withdrawal from crack cocaine in which the person "is only responding to those centers in what we call the primitive brain," "reacting wildly" and, in the case of homicides, "overkill[ing] the victim." *Id.* at 59. In her opinion, Barber's addiction played a role in Epps' death. She believed that Barber "probably was just so out of control and reacting so wildly that he did not realize what he was doing, much less . . . realize the ultimate impact of his actions, that he would in fact kill her or hurt her." *Id.* at 68–69.

Lastly, Rosenzweig testified that Barber had adjusted well while incarcerated. "[I]n a prison environment, presuming he would not have access to substances," Rosenzweig had "every expectation that [Barber] would continue to be a model prisoner and would pose no risk to other inmates or to the correctional staff." *Id.* at 63.

The jury recommended a death sentence by a vote of 11 to 1.  The trial court adopted the jury's recommendation and imposed a death sentence, finding two aggravating circumstances:  the murder was committed during a robbery and was especially heinous, atrocious, or cruel.

## C. Direct Appeal and Postconviction Proceedings

The CCA upheld Barber's conviction and sentence on direct appeal.  *See Barber*, 952 So. 2d at 393, 464, *cert. denied*, 549 U.S. 1306 (2007).  Barber timely filed a state postconviction motion under Alabama Rule of Criminal Procedure 32, which challenged his conviction and sentence.  As relevant to this appeal, Barber claimed that his trial counsel rendered ineffective assistance in failing to investigate and present an adequate case in mitigation of the death penalty.  The Rule 32 court granted him an evidentiary hearing, and he presented testimony from 10 witnesses, including Barber's lead trial counsel and investigator, Rosenzweig, family members, a friend, an expert in psychopharmacology and addiction, an expert in clinical psychology and forensic psychology and assessment, and Barber himself.[2]

---

[2] Co-counsel in Barber's case died about a year after trial, before the evidentiary hearing.

Because we assume for purposes of analyzing Barber's claim under *Strickland v. Washington*, 466 U.S. 668 (1984), that trial counsel performed deficiently, we do not recount testimony that went only to deficient performance, including that of trial counsel, the defense investigator, and Rosenzweig.

Family members and a friend testified that Barber grew up in a house with little oversight or structure. They testified that Barber was surrounded by "bad influences," including an older brother and brother-in-law who had problems with addiction. Doc. 15–64 at 146. They testified that several members of the family had mental health issues, including depression, severe anxiety, and substance abuse disorders. Barber's sister testified that Barber had once attempted suicide. Barber testified to his drug and alcohol use, which started around age 12 and intensified (except for a brief period of relative sobriety) until the murder.

Postconviction counsel's experts testified about the effects of cocaine use, withdrawal, and addiction, as well as risk factors for cocaine addiction. Psychopharmacology and addiction expert William Alexander Morton, Jr., testified that addiction is a "brain disease," Doc. 15-65 at 107, and that people who use crack cocaine "are mildly violent to extremely violent," *id.* at 115. Morton testified that Barber's videotaped confession was "an incredible . . . video of addiction" in that it showed memory impairment and impulsivity. *Id.* at 122.

Clinical psychology and forensic psychology and assessment expert Dr. Karen Lee Salekin testified that Barber's background, which she reviewed extensively, contained "a lot of risk factors [for addiction] throughout the early child development teen years into adulthood and very few protective factors." *Id.* at 164. Community and school risk factors included the high availability of drugs

11

and alcohol in his community, community norms that supported substance use, community economic deprivation, a family history of substance abuse, a family history of criminality and mental illness, lack of family cohesion, detached parenting, and lack of academic success.  Barber's individual risk factors included "unchecked defiance at [an] early age," "influence of peer group," "favorable attitude to problem behaviors," and "early initiation of problem behavior," including first use of alcohol at only eight years of age.  Doc. 15-66 at 11–15.  Salekin testified that Barber had symptoms of depression, including one suicidal "gesture" and one attempt.  *Id.* at 17.  Of protective factors in Barber's history, Salekin testified that "there aren't many and they weren't strong."  *Id.* at 21.  The risk factors, Salekin testified, "were far more powerful" than the "few protective factors."  *Id.* at 22–23.

After the evidentiary hearing, the Rule 32 court denied relief.  Barber appealed to the CCA, which affirmed.  As to his ineffective assistance of counsel claim, the CCA concluded that Barber failed to show his trial counsel performed deficiently or that any deficiency prejudiced him.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) (explaining that, to establish ineffective assistance of counsel, the defendant "must show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense").  The Alabama Supreme Court denied Barber's petition for a writ of certiorari.

12

### D. Federal Habeas Proceeding

After he exhausted his state appeals, Barber filed a petition for a writ of habeas corpus in federal district court, raising several claims including his ineffective assistance of counsel claim. The district court denied Barber relief and declined to issue a certificate of appealability ("COA"). This Court granted Barber a COA on his ineffective assistance of counsel claim only.

## II.

"When reviewing a district court's grant or denial of habeas relief, we review questions of law and mixed questions of law and fact *de novo*, and findings of fact for clear error." *Reaves v. Sec'y, Fla. Dep't of Corr.*, 717 F.3d 886, 899 (11th Cir. 2013) (internal quotation marks omitted). An ineffective assistance of counsel claim "presents a mixed question of law and fact that we review *de novo*." *Pope v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 1254, 1261 (11th Cir. 2014).

Because the CCA decided Barber's ineffective assistance of counsel claim on the merits, we must review that court's decision under the highly deferential standards set by Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See Wilson v. Sellers*, 138 S. Ct. 1188, 1191–92 (2018). AEDPA bars federal courts from granting habeas relief to a petitioner on a claim that was adjudicated on the merits in state court unless the relevant state court's adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). If we decide that the state court's decision was contrary to or involved an unreasonable application of clearly established precedent or was based on an unreasonable determination of the facts in light of the record, we are "unconstrained by § 2254's deference and must undertake a *de novo* review of the record." *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1260 (11th Cir. 2016) (internal quotation marks omitted).

## III.

Barber claims that his trial counsel were ineffective in failing to investigate and present any evidence regarding Barber's mental health problems, negative role models, and parental neglect, and in failing to adequately investigate and present evidence about the extent and severity of Barber's substance abuse problems. Under *Strickland*, 466 U.S. at 686, a defendant has a Sixth Amendment right to effective assistance of trial counsel. Counsel renders ineffective assistance, warranting vacatur of a conviction or sentence, when his performance falls "below an objective standard of reasonableness," taking into account prevailing professional norms, and when "there is a reasonable probability that, but for

14

counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

We assume for present purposes that trial counsel's performance was deficient. *See Knight v. Fla. Dep't of Corr.*, 958 F.3d 1035, 1046 (11th Cir. 2020) ("We think it simplest and most straightforward to start, in this case, from the other end of the *Strickland* standard. For purposes of our analysis, we will simply assume (without deciding) that [counsel's] representation fell below an objective standard of reasonableness sufficient to establish deficient performance, and focus our assessment on the prejudice prong." (internal quotation marks and citation omitted)). We also assume that the CCA's prejudice determination was based on an unreasonable application of clearly established law, and thus AEDPA deference is not owed.[3] *See Castillo*, 722 F.3d at 1283. We do so because even under *de*

---

[3] Although we make this assumption, we note that the proposition is likely true: the CCA appears to have applied standards contrary to *Strickland* in assessing both prongs of Barber's ineffective assistance of counsel claim.

As to deficient performance, the CCA contrasted "counsel's complete failure to conduct a mitigation [investigation]," where a deficient performance finding would be "likely," and "counsel's failure to conduct an adequate investigation where the presumption of reasonable performance is more difficult to overcome." Doc. 15-68 at 23. The court explained, "[t]he cases where this court has granted the writ for failure of counsel to investigate potential mitigating evidence have been *limited to* those situations in which defense counsel have *totally failed* to conduct such an investigation." *Id.* (emphasis added). Although *Strickland* establishes a presumption of reasonable performance, that presumption does not preclude relief when there was some investigation. *See Strickland*, 466 U.S. at 689–91.

On prejudice, the CCA said "the focus is on whether the sentencer *would have concluded* that the balance of aggravating and mitigating circumstances did not warrant death," Doc. 15-68

*novo* review Barber cannot demonstrate that counsel's failure to investigate and present mitigating evidence prejudiced his defense.

"In evaluating prejudice, our task is to review the new evidence presented by [Barber] and then 'reweigh the evidence in aggravation against the totality of available mitigating evidence.'" *Knight*, 958 F.3d at 1046 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 198 (2011)). After review of the evidence Barber presented at his Rule 32 hearing as well as the mitigating evidence the jury heard and a reweighing of the totality of that evidence against the aggravating evidence, we conclude that Barber has not shown prejudice.

Much of the evidence introduced at Barber's Rule 32 hearing "fill[ed] in some of the details of [Barber's] drug use," but it did not "add anything truly new" given Rosenzweig's testimony at the penalty phase of Barber's trial about the effects of addiction on his life and commission of this crime. *Id.* at 1047. Although the details and perspectives about Barber's drug use—particularly from Morton and Salekin—undoubtedly have mitigating value, they do not add substantial heft to Barber's case in mitigation because the jury learned much of it from Rosenzweig. *Id.*; *see also Dallas v. Warden*, 964 F.3d 1285, 1308–11 (11th Cir. 2020) (explaining that such cumulative evidence, though it "substantiates,

at 24 (internal quotation marks omitted), which is a higher standard than *Strickland*'s "reasonable probability" of a different result, *see Strickland*, 466 U.S. at 694.

16

supports, or explains" testimony provided at trial, has limited value (alterations adopted) (internal quotation marks omitted)).

Some of the evidence introduced at Barber's Rule 32 hearing was new evidence that the jury never heard:  Barber had a family history of mental health issues (including his own battles with depression and suicidal gestures or attempts), was exposed early to negative role models, and was subject to a detached parenting style.[4]  Although this new evidence "paints a darker picture" of Barber's background, *Dallas*, 964 F.3d at 1311, it does not, when combined with the other mitigating evidence, raise a reasonable probability that the jury would not have recommended a sentence of death.  The aggravating circumstances in this case are simply too great to permit us to find a probability of a different outcome had the jury heard what Barber presented at his Rule 32 hearing.  The jury heard that Barber took advantage of his friendly relationship with a frail, elderly woman to gain access to her home and then brutally beat her to death, first with his fists and then with a hammer.  The jury heard that Epps moved about the house during the attack and tried to defend herself from Barber's onslaught with nothing but her bare hands.  Jurors heard that Epps had wounds all over her body and Barber's

---

[4] Arguably the jury heard some about Barber's parents' child-rearing:  Dr. Rosenzweig testified that because of the number of children in the house, each child did not get a lot of individual attention.  We assume for purposes of this opinion that evidence at postconviction about the complete lack of household discipline and oversight was new.

17

footprint on her back, and they saw gruesome photographs of her injuries. They heard that Barber stole Epps' purse in the hopes it would contain money he could use to buy drugs. Put plainly, "[t]his is not a case where the weight of the aggravating circumstances or the evidence supporting them was weak." *Sochor v. Sec'y, Dep't of Corr.*, 685 F.3d 1016, 1030 (11th Cir. 2012) (internal quotation marks omitted). It is a case where "the disparity between what was presented at trial and what was offered collaterally" was insufficiently great to shift "the balance between the aggravating and mitigating evidence." *Dallas*, 964 F.3d at 1312.

In sum, "[i]n the face of the horrific nature of [Barber's] crime and the brutality of [Epps'] death, and because the jury already knew much about [Barber's] life, there is no reasonable probability that, had the jury known the limited additional details presented in postconviction, they would have spared his life." *Id.* at 1312–13. We affirm the denial of relief on Barber's ineffective assistance of counsel claim.

**AFFIRMED.**